In the

# United States Court of Appeals

## For the Seventh Circuit

———————

Nos. 17-1650, 17-2854, 17-2858, 17-2877, 17-2899, 17-2917, 17-2918, 17-2931, 17-3063, & 17-3449

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

BYRON BROWN, *et al.*,

*Defendants-Appellants.*

———————

Appeals from the United States District Court for the
Northern District of Illinois, Eastern Division.
Nos. 13 CR 288 & 13 CR 774 — **John J. Tharp, Jr.**, *Judge*.

———————

ARGUED JUNE 3, 2020 — DECIDED AUGUST 28, 2020

———————

Before SYKES, *Chief Judge*, and WOOD and ST. EVE, *Circuit Judges*.

WOOD, *Circuit Judge*. This case offers a window into the violent and ruthless world of the Hobos street gang, which operated in Chicago from 2004 to 2013. With the credo, "The

Earth is Our Turf," the Hobos worked to build their street reputation and control certain areas on Chicago's south side. Ten gang members were charged and convicted for violations of the Racketeer Influenced and Corrupt Organizations (RICO) Act, among other crimes. Nine of those defendants have joined in the present appeals: Byron Brown, Gabriel Bush, Gregory Chester, Arnold Council, William Ford, Rodney Jones, Paris Poe, Derrick Vaughn, and Stanley Vaughn. We find no reversible error in the convictions for any of the defendants. Nor do we find any error in any of the sentences, except for Chester's, which must be revisited.

# I

## A

The defendants now before us were the core group that formed the Hobos. Although the Hobos did not have a structure as firmly hierarchical as that found in many gangs, it did have a leader (Chester) and senior members (Council, Bush, and Poe). Most members had roots in other gangs, such as the Gangster Disciples (GDs) and Black Disciples (BDs).

We need not recount all of the Hobos' multifarious criminal activities. We focus instead on the specific incidents the government emphasized at trial. Where necessary, we include further details. Generally speaking, those activities fell into three broad categories: drug trafficking, murder (including attempted murder), and robbery.

*Drug Trafficking*. The Hobos ran many drug lines throughout Chicago's south side. Defendant Bush managed two heroin lines, known as "Cash Money" (identifiable by the baggies' green dollar signs) and "X-Men" (identifiable by the red Xs on the baggies). Ford and others sold the Cash Money line

at 47th Street and Vincennes Avenue, and Hobo-associate Kevin Montgomery sold Cash Money at 51st Street and Martin Luther King Drive. Members of another gang known as Met Boys sold X-Men at 51st Street and Calumet Drive. Bush also had a drug line at the Ida B. Wells housing project.

Council and other Hobos oversaw drug lines at the Robert Taylor Homes, selling "Pink Panther" marijuana and crack cocaine (so named for the Pink Panther logo on their baggies). Derrick Vaughn (to whom we refer as Derrick, to differentiate him from his brother and co-defendant, to whom we refer as Stanley) sold cocaine at 47th and Vincennes. The Hobos also supplied drugs to each other: Council provided marijuana and crack cocaine to various Hobos, and Chester supplied heroin.

*Murders and Attempted Murders*. The Hobos liberally used violence to retaliate against rival gangs, harm people who cooperated with law enforcement, and defend their drug trafficking territory. The Hobos had long-running rivalries with several other gangs, including the BDs and associated BD factions such as New Town and Fifth Ward, the Row GDs, and the Gutterville Mickey Cobras. These rivalries precipitated numerous shootings.

For example, in April 2006, Fifth Ward BD Cordale Hampton and his uncle were driving when they were shot at by a passenger in a car driven by Stanley. Both were hit—Hampton on his neck, side, leg, and arm, and his uncle on his head—but both survived. Two months later, in June 2006, Chester was leaving his girlfriend's apartment, which was located in the New Town BDs' territory, when he was shot (amazingly not fatally) 19 times. In September 2006, occupants of a car

shot at Chester while he was at a southside car wash. The bullets struck him but did not kill him, and Poe fired back at the car to protect Chester. Chester, believing the BDs were responsible for these shootings, put out a $20,000 bounty on the leader of the New Town BDs, Antonio Bluitt. The bounty, however, did not intimidate Bluitt. Instead, Bluitt announced a retaliatory bounty on Chester and Council, sparking more violence.

In February 2007, Derrick was at a local Hobos hangout, a barbershop, when he saw Fifth Ward BD Devin Seats outside a nearby shop. Derrick opened fire, hitting Seats multiple times. In June 2007, while riding in a car with Ford, Council, and Chad Todd (a Hobo-turned-cooperator), Bush shot at Bluitt-associate Andre Simmons and Simmons's cousin Darnell. He hit them several times, causing Andre to lose an eye. Later that month, Bush, Todd, and the Vaughn brothers shot New Town BD Jonte Robinson nine times as he was walking into a daycare center to pick up his son.

In July of the same year, Bush, Ford, and Todd spotted several teenagers they thought were Fifth Ward BDs. Bush and Ford shot the teenagers, striking one of them in the face. The Hobos were mistaken: the victims had no gang affiliation. A month later, Council and Bush shot New Town BD Eddie Jones.

In September 2007, Bush, Council, Derrick, Ford, Stanley, and others made good on Chester's bounty by killing Bluitt and Fifth Ward BD Gregory Neeley in a drive-by ambush. Bluitt, Neeley, and others were sitting in a Range Rover after leaving a funeral when the attackers drove by in a four-car caravan, firing at the Range Rover. That same month, Bush

and Council killed Terrance Anderson, who managed a competing drug line. Bush and Council shot Anderson five times while he was attending a reunion party for the Robert Taylor Homes.

Rival gang members were not the Hobos' only targets. They also retaliated against cooperators. The trial evidence highlighted two such victims—Wilbert Moore and Keith Daniels—both of whom the defendants killed because of their work for law enforcement.

Moore dealt drugs in the Ida B. Wells housing projects. In 2004, he started cooperating with the Chicago Police Department (CPD). Information he provided led to the search of an apartment from which Council supplied crack cocaine. During the search, CPD officers seized cocaine, crack cocaine, heroin, cannabis, and firearms from the apartment. Council figured out that Moore was the informant.

In January 2006 Council and Poe, with Bush's assistance, killed Moore. Bush spotted Moore's car parked outside of a barbershop and made a phone call. Council and Poe quickly arrived on the scene. As Moore left the barbershop, Poe fired at him from Council's car. Moore attempted to flee, but he tripped in a nearby vacant lot, allowing Council and Poe to catch up to him. Poe immediately shot him in the face.

Daniels was Council's brother and a Hobo. In 2011 he began providing information about the Hobos to law enforcement. He also participated in three controlled buys of heroin from Chester and another Hobo, Lance Dillard. Suspecting something, the Hobos decided to silence him. Ford sneaked into Daniels's apartment, pulled out a gun, and told Daniels to take a ride with him. Daniels refused and, soon after, the

FBI temporarily relocated him. But that did not prove to be enough.

On April 4, 2013, Daniels testified about the Hobos and his controlled buys before a federal grand jury. A week later, Chester was arrested on a criminal complaint that alleged that Chester distributed heroin to Daniels. Chester told the arresting agents that he knew Daniels was the informant. Shortly after Chester's arrest, Poe cut off his electronic monitoring bracelet, and on April 14, 2013, Poe murdered Daniels in front of Daniels's girlfriend and children.

*Robberies*. The Hobos frequently conducted robberies, home invasions, and burglaries. A few vivid examples suffice. At a nightclub in June 2006, Poe robbed NBA basketball player Bobby Simmons of a $100,000 necklace. A car chase followed, and Poe shot at Simmons's car from Council's car. Later in 2006, Brown, Jones, and a Met Boy entered a drug dealer's home and shot, punched, and stabbed him for information about the location of his drugs. They took $20,000 worth of marijuana and gave some to Council.

In 2007, Bush, Council, and Stanley robbed a heroin supplier. In July 2008, Brown and Jones burglarized a home. While fleeing from police, they crashed into a car driven by Tommye Ruth Freeman, an elderly woman, killing her. In November 2008, Council and three other Hobos robbed a clothing store called Collections, stealing merchandise worth $17,488.

We could go on, but the picture is clear: the Hobos were a violent, dangerous gang, and each of the defendants in this case was an active participant in its activities.

B

Before we proceed to the defendants' many contentions, we offer a brief overview of the charges. Of the nine defendants involved in these appeals, three pleaded guilty to one count of RICO conspiracy, in violation of 18 U.S.C. § 1962(d) (Count 1): Brown, Jones, and Stanley. Brown also pleaded guilty to one count of murder in aid of racketeering, in violation of 18 U.S.C. § 1959(a) (Count 4), for the murder of Eddie Moss. The remaining six defendants proceeded to trial. The following chart shows who among the latter group was convicted and for what:

| # | Charge (Violated Statute) | Bush | Chester | Council | Derrick | Ford | Poe |
|---|---|---|---|---|---|---|---|
| 1 | RICO Conspiracy (18 U.S.C. §1962(d)) | G[1] | G | G | G | G | G |
| 2 | Murder of Moore in Aid of Racketeering (18 U.S.C. §1959(a)(1)) | | | G | | | G |
| 3 | Murder of Anderson in Aid of Racketeering (18 U.S.C. §1959(a)(1)) | G | | | | | |
| 4 | Murder of Bluitt in Aid of Racketeering (18 U.S.C. §1959(a)(1)) | | | | G | | |

---

[1] The letter "G" indicates guilty; "NG" indicates not guilty.

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 5 | Murder of Neeley in Aid of Racketeering (18 U.S.C. §1959(a)(1)) | | | | G | | |
| 6 | Obstruction of Justice through Murder of Daniels (18 U.S.C. §§1503(a) & (b)(1)) | | | | | | G |
| 7 | Use of Firearm During Crime of Violence (Robbery of Collections) (18 U.S.C. §924(c)) | | | G | | | |
| 8 | Possession of Firearm by a Felon (18 U.S.C. §922(g)) | | | | | G | |
| 9 | Possession with Intent to Distribute Marijuana (21 U.S.C. §841(a)(1)) | | | | | G | |
| 10 | Possession of Firearm in Furtherance of Drug Trafficking Crime (18 U.S.C. §924(c)) | | | | | NG | |

The trial lasted about four months, and more than 200 witnesses testified. The jury found all six defendants guilty of all counts, except for the charge against Ford in Count 10. The district court sentenced all the defendants to lengthy terms in prison.

Eight of the defendants have appealed from their convictions, their sentences, or both; defendant Jones's attorney has filed a no-merit brief pursuant to *Anders v. California*, 386 U.S. 738 (1967). We have sorted the myriad arguments before us into five different major headings: Section II addresses the sufficiency of the evidence presented at trial; Section III tackles various evidentiary challenges; Section IV addresses sentencing contentions; Section V discusses Brown's individual

arguments; and Section VI addresses the *Anders* brief for defendant Jones.

## II

We begin with the defendants' challenges to the sufficiency of the evidence. Such challenges face a high hurdle: we afford great deference to jury verdicts, view the evidence in the light most favorable to the jury's verdict, and draw all reasonable inferences in the government's favor. *United States v. Moreno*, 922 F.3d 787, 793 (7th Cir. 2019). We may set aside a "jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury." *Cavazos v. Smith*, 565 U.S. 1, 2 (2011).

### A.  Count 1 – RICO Conspiracy

#### 1.  Joint Arguments

Chester, Council, Bush, Derrick, Ford, and Poe all argue that there was insufficient evidence to support the jury's guilty verdicts on Count 1. As we noted before, Count 1 charged these six under RICO with conspiring to engage in a racketeering enterprise known as the Hobos, in violation of 18 U.S.C. § 1962(d). To prove a RICO conspiracy, "the government must show (1) an agreement to conduct or participate in the affairs (2) of an enterprise (3) through a pattern of racketeering activity." *United States v. Olson*, 450 F.3d 655, 664 (7th Cir. 2006); see *Salinas v. United States*, 522 U.S. 52, 61–66 (1997). The defendants contend that there was insufficient evidence that the Hobos were an enterprise.

Under the RICO statute, an "enterprise" includes "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in

fact although not a legal entity." 18 U.S.C. § 1961(4). An association-in-fact includes any "group of persons associated together for a common purpose of engaging in a course of conduct." *Boyle v. United States*, 556 U.S. 938, 946 (2009). The Supreme Court reads this definition broadly. An association-in-fact under RICO need not have any structural features beyond "a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Id.*

The defendants argue that the government failed to prove the necessary agreement. They admit that they came together at different times to engage in crimes, but they contend that they were no more than "independent participants involved in unrelated criminal activity operating [without a] common purpose." They emphasize that the Hobos had no rules. Although most gangs allegedly have initiations, treasurers, dues, and manifestos, the Hobos did not bother with those formalities.

The defendants also dispute the government's contention that the Hobos' loyalty and protection of one another was indicative of common purpose. The evidence on which the government relies, they argue, showed only that this bond existed in certain individual cases, rather than being a feature for all members of the gang. For example, while Chad Todd initially claimed that the Hobos protected one another, he later admitted that he was willing to kill only for Bush and not for any other Hobo. Todd also testified that at one point Bush wanted to kill the Vaughn brothers for attempting to extort him.

Finally, the defendants assert that the government failed to prove that the Hobos had an internal hierarchy, and with-

out any pecking order, there could be no coordination or common purpose. The government labeled Chester as the leader of the Hobos, but Todd testified that he never saw Chester send money down to any members of the gang below him, and he never saw people send money up to Chester. Each of the six of them, the defendants argue, did no more than engage in "[a]ccidentally parallel" criminal activity that happened occasionally to overlap; they shared no coordinated purpose.

Perhaps that is one way to view the evidence, but it is not the only one. The defendants' course of conduct, "viewed in the light most favorable to the verdict, was neither independent nor lacking in coordination." *United States v. Hosseini*, 679 F.3d 544, 558 (7th Cir. 2012). Together the defendants worked to control an exclusive territory. They earned money through drug dealing and robberies, protected each other, and killed rival gang members and others who posed threats, including government cooperators.

Many witnesses testified that the gang was a distinct, identifiable group. We name a few. Jones and Todd (Hobos who became cooperators) confirmed that an organization called the Hobos existed and they were members. Todd considered Derrick, Stanley, and Ford to be Hobos, and Chester to be the leader of the Hobos. He also said that Council, Poe, and Bush each had a "position of authority." The jury reasonably could see this as evidence of a hierarchy, albeit a loose one. Jones testified that Council, Bush, Derrick, Ford, and Chester, among many others, were also Hobos. Bland and Montgomery described the Hobos as a gang. Cashell Williams, a Fifth Ward BD, testified that his gang had a rivalry with the Hobos.

Additional evidence showed that the Hobos were not just a group of criminals acting individually. They protected each other and retaliated on behalf of one another. For example, all the trial defendants except for Poe were involved in the murders of Bluitt and Neeley. In so doing, they were carrying out Chester's orders. In addition, Bush, Council, Ford, and Todd shot the Simmonses, and Bush, Derrick, Todd, and others shot Jonte Robinson. The jury was entitled to conclude that the Hobos shot the BDs to retaliate against a rival gang and to control Hobos territory.

And this was not all. Many other crimes illustrated the relationships among the Hobos and their network. Council and Poe murdered Moore based on a tip from Bush. Council and Bush murdered Anderson. Council and Poe robbed Bobby Simmons. And the Hobos shared weapons to commit these crimes.

The jury also heard evidence about the defendants' cooperative drug trafficking. As we noted earlier, Bush ran the Cash Money and X-Men drug lines, supplying the drugs and receiving the proceeds. Council operated the Pink Panther drug line. They did not run these drug lines alone. Ford managed certain Cash Money drug spots, and Montgomery collected money for Bush. Bush and Council occasionally used the same apartment to package drugs. This was evidence showing that the Hobos' drug activity was interconnected and a source of income for the gang.

The Hobos also showed their unity through tattoos and hand signs. Chester's tattoo says "Hobo" and "The Earth Is Our Turf," with images of firearms, a bag of money, and two buildings. Poe has Hobos tattoos. One says "Cheif [*sic*] Hobo" and the other says "The Earth Is Our Turf" and "Hobo."

Ford's tattoo says "hobo 4Life." Poe, Chester, and other Hobos also stitched "Hobo" into their cars' headrests.

Although there is much more evidence to the same effect in the record, we have no need to rehearse all of it. Bearing in mind the standard of review for challenges to the sufficiency of the evidence, we have no trouble concluding that the evidence before this jury was sufficient to establish a RICO enterprise.

### 2. Derrick Vaughn

Derrick contends that even if there was a Hobos enterprise, he was not a member of it and he did not conspire with the Hobos. He concedes that he sold a small quantity of drugs and was present at the scene of several Hobos crimes, but he insists that there was no evidence that he was a participant (rather than a mere bystander) in those crimes.

In order to support Derrick's conviction on Count 1, the government was required to prove "that another member of the enterprise committed ... two predicate acts and that [Derrick] knew about and agreed to facilitate the scheme." *United States v. Faulkner*, 885 F.3d 488, 492 (7th Cir. 2018) (internal quotation marks omitted). "It did not … need to show that he was personally involved in two or more of the predicate acts." *Id.*

The record contains ample evidence of Derrick's participation in the Hobos' racketeering activity. For example, in recorded conversations between Derrick and Courtney Johnson (a government cooperator), Derrick admitted to Johnson that he participated in the Bluitt and Neeley murders. He described hearing his co-conspirators' gunshots and mentioned that he saw the victims dead. Even though Derrick may not

specifically have uttered the word "Hobos," he nevertheless revealed his ties to and knowledge of the Hobos when he commented that the purpose of the murders was to retaliate on Chester's behalf because the BDs earlier had shot Chester. Derrick also described shooting Seats: "So I come from around the gate I boom, boom, boom[.]" And Derrick discussed the Hobos' attempts to eliminate the BD's competing drug trafficking: "[T]hey had a line down there … we put a stop to that."

Several of Derrick's co-defendants also implicated him. In a recorded conversation, Ford mentioned Derrick's involvement in the Bluitt and Neeley murders. Jones similarly testified that Derrick was a passenger in Ford's car during the drive-by murders of Bluitt and Neeley and that Derrick was armed.

The jury was entitled, based on the evidence before it, to conclude that Derrick shot Seats as part of the conspiracy. Todd testified that he saw Derrick shoot Seats. Although Seats himself did not see the shooter, Seats testified that he saw Derrick's Grand Prix near the barbershop where he was shot and that Derrick had threatened to kill him earlier the same day. Derrick emphasizes that Seats described their dispute as personal and unrelated to their respective gang affiliations, and so, in his view, the shooting could not have been part of a conspiracy. But once again, the jury did not have to accept that interpretation of the evidence. And this jury did not. There was also a recorded conversation in which Derrick told Johnson that he shot Seats after seeing Fifth Ward BDs near the barbershop. The jury evidently credited this admission and found that the shooting furthered the conspiracy. In sum, Derrick's individual attack on the sufficiency of the evidence

to support his conviction on Count 1 fares no better than the collective argument.

### B. Count 2 and Additional Findings – Moore's Murder

Council and Poe were the only two defendants charged with Moore's murder. They both argue that there was insufficient evidence to support their convictions on this Count, which charged them with murdering Moore in aid of the Hobos racketeering conspiracy, in violation of 18 U.S.C. § 1959(a)(1). Bush also joins this argument insofar as it bears on the jury's special findings in Count 1 connecting him to Moore's murder. The jury made the Additional Findings that the murder was committed "because Moore was a witness in any prosecution or gave material assistance to the State of Illinois in any investigation or prosecution, either against the defendant or another person," and that "[the murder] was committed in a cold, calculated, and premeditated manner pursuant to a preconceived plan, scheme, and design to take a human life by unlawful means, creating a reasonable expectation that the death of a human being would result therefrom."

The record contains ample evidence that supports both Council's and Poe's convictions and the Additional Findings. Several witnesses implicated the three defendants. Kevin Montgomery, who managed one of Bush's drug lines, testified that he was in Bush's car near 43rd Street and Langley Avenue when he heard Bush say on his phone that "this blue thing is out here," referring to a blue car parked in front of the barbershop. Montgomery also testified that a few minutes later, Council and Poe pulled up in a Chevy Malibu. Montgomery saw Poe fire a .40 caliber firearm from the back passenger window. Bush and Montgomery then left the scene.

That night, Bush reported to Montgomery that Moore had been killed. Bush remarked, "I just seen that whip [car] out there, you know. I wasn't looking forward to that either. … So I made that call." He also told Montgomery that Council and Poe "got" Moore, explaining that Council and Poe chased Moore, Moore was "whipping" Council, and then Poe walked up and shot him. Bush said they killed Moore because Moore "sent the feds to [Council's] crib" and they "found a half a book [kilo] of coke and a chopper [assault rifle]."

People who lived in the surrounding area corroborated this account. Alan Pugh lived in an apartment building on Langley Avenue. Through a window he saw a Black man "running for his life," chased by another Black man as a red Mitsubishi Galant drove parallel to them. The first man ran into a vacant lot, where he slipped near a van. The second was "upon him almost instantly" and shot him in the head. A third man got out of the red car, walked to the victim, and then the two men "calmly" left in their car. Tiajuana Jackson, who lived nearby, testified that she heard gunshots, ran downstairs, and saw a maroon vehicle speeding east on 43rd Street before making a left on Langley.

Offering further support, Marcus Morgan, a Met Boy, testified that, while housed together at Cook County Jail, Poe told him that he killed Moore. Rodney Jones testified that Council told him that Moore had sent the police to Council's house. And Poe told Jones that Moore was holding his hands up, but Poe shot him anyway. Brian Zentmyer, Poe's cellmate, testified that Poe bragged about Moore's murder and explained that he killed Moore because Moore "turned state evidence on another Hobo," Council.

Physical evidence corroborated the witnesses' testimony. Casings were recovered near the barbershop and near Moore's body, suggesting that the shooting started near the barbershop and continued into the vacant lot. A .40 caliber cartridge was found near the blue car, corroborating Montgomery's testimony about the type of weapon. Moreover, toolmark analysis established that one of the guns used in Moore's murder had also been used in the shooting of Cordale Hampton and his uncle—also a Hobos operation.

Council, Poe, and Bush argue that Montgomery's and Jones's testimony was incredible as a matter of law. They point to several inconsistencies. First, Montgomery described Council's car as a burgundy "boxed" Chevy Malibu, whereas Pugh described a red Mitsubishi Galant. In addition, Montgomery originally stated that Bush was driving his own tan Pontiac Bonneville, but then later he said that Chester owned the car. Montgomery also testified that Bush had told him that Poe shot and killed Moore after Moore and Council were fighting. Yet Pugh did not mention a fight in his testimony. In addition, the defendants point to discrepancies between Montgomery's and Pugh's descriptions of the route Council took in following Moore. They also note that while Jones testified that Poe told him that he put his gun "up under a van" to shoot Moore, no shell casings were found under the van. The defendants urge that these inconsistencies, added to the fact that Montgomery and Jones had "every incentive to falsely tailor a story to fit … law enforcement's needs," render the testimony incredible as a matter of law.

Defendants overstate the problems. A determination that testimony is incredible is reserved for extreme situations

where, for example, "it would have been physically impossible for the witness to observe what he described, or it was impossible under the laws of nature for those events to have occurred at all." *United States v. Conley*, 875 F.3d 391, 400 (7th Cir. 2017). Nothing of that magnitude exists here; we see only ordinary failures to recall with specificity, or perhaps dissembling. We do not dispute the basic point that there were inconsistencies among the witnesses' accounts, but the jury was entitled to decide which parts to credit and which to reject. As the district court noted, "for all we know, the jurors did reject the entire testimony of one or more of these witnesses, which would still leave sufficient evidence to convict." Moreover, "[i]t is the jury's job, and not ours, to gauge the credibility of the witnesses and decide what inferences to draw from the evidence." *United States v. Stevenson*, 680 F.3d 854, 857 (7th Cir. 2012). "We do not second guess such determinations on appeal." *Id.* The jury believed that the three defendants participated in the murder of Moore, and they have given us no reason to question that decision.

Next, the defendants argue that even if they actually committed the murder, the government failed to present sufficient evidence that it was "for the purpose of … maintaining or increasing position in" the Hobos enterprise, as required under 18 U.S.C. § 1959(a)(1). The question here is whether there was evidence permitting the jury to "infer that the defendant committed his violent crime because he knew it was expected of him by reason of his membership in the enterprise or that he committed it in furtherance of that membership." *United States v. DeSilva*, 505 F.3d 711, 715 (7th Cir. 2007) (internal quotation marks omitted).

The government's theory was that Moore was murdered because he cooperated with the authorities and was the (unnamed) affiant on a search warrant for Council's residence. The defendants respond that there is no documentary evidence that supports this contention, and that the theory is based entirely on the testimony of CPD Officer Edwin Utreras, who prepared the search warrant affidavit. Moreover, the defendants argue, even if Moore was the informant, there was no evidence that Council knew this, nor any evidence that this information was communicated to Poe or Bush. Finally, the defendants say, even if we accept the government's position that Council knew that Moore was the informant, "at best the government's evidence established that the murder of Wilbert Moore was committed for personal revenge." The criminal case that resulted from the search was dismissed well before the murder, and so (they conclude) the only possible motive for the murder would be revenge.

We begin with the defendants' argument that there was insufficient evidence that Moore had cooperated against Council. As the district court noted, this argument was "fully vetted at a *Franks* [*v. Delaware*, 438 U.S. 154 (1978)] hearing on the subject of whether the search warrant for Council's apartment was based on false information." The hearing established that "Moore had in fact acted as an informant and supplied the basis for the search warrant." We see no reason to overturn that assessment.

Next, contrary to the defendants' contentions, there was evidence that the Hobos knew that Moore had snitched on Council. Montgomery testified that Bush told him Moore was killed because Moore "sent the feds to [Council's] crib," where they "found a half a book of coke and a chopper."

Council also told Jones that Moore sent the police to his house, and Poe told Zentmyer that he killed Moore because Moore "turned state evidence" on Council. The jury chose to credit at least one of these witnesses. Moreover, although at the time of Moore's murder Council no longer faced charges based on the search, there was ample evidence that the Hobos had an interest in punishing cooperators and deterring further cooperation. Personal revenge might have been a factor in Moore's demise, but a jury could reasonably find that maintaining or advancing their position in the Hobos was another.

Finally, the defendants argue that there was insufficient evidence that Moore's murder was "committed in a cold, calculated and premeditated manner pursuant to a preconceived plan, scheme and design." Under Illinois law, first-degree murder does not carry a life sentence unless certain aggravating factors exist. Premeditation is one such factor. It requires a "substantial period of reflection or deliberation." *People v. Williams*, 193 Ill. 2d 1, 31 (2000). That deliberation must take place over "an extended period of time." *Id*. at 37. The defendants argue that Moore's murder does not satisfy that element, because only a few minutes elapsed between when Bush placed a call stating that the "blue thing is out here" and when Council and Poe drove up and began shooting at Moore.

But there is no reason why we should limit the relevant time to the period between Bush's call and the shooting. A rational jury could conclude that the group had hatched its plan to murder Moore much earlier. Bush made a call referring only to "the blue car," yet Council and Poe knew just what he meant. They showed up instantly and began shooting. Furthermore, the search of Council's "crib" occurred about 18 months before Moore's murder. This was enough to permit

the jury to find that Moore's murder was cold, calculated, and premeditated.

C.  Count 3 – Anderson's Murder

Count 3 alleged that Bush murdered Terrance Anderson in aid of the racketeering enterprise, in violation of 18 U.S.C. § 1959(a). Bush argues, once again, that there was insufficient evidence to support the jury's guilty verdict. Council joins Bush in attacking the sufficiency of the evidence for the jury's related special findings that Council's and Bush's racketeering activity included the commission, or at least aiding and abetting, of Anderson's murder.

Bush does not challenge the finding that he shot Anderson at the reunion party for the Robert Taylor Homes. He argues instead that he did not have the requisite "intent to kill" Anderson. It is hard to take this point seriously, given the fact that Bush pleaded guilty in state court to the second-degree murder of Anderson. There he stated under oath that he was guilty of the charge that he "without lawful justification, *intentionally and knowingly* shot and killed Terrance Anderson while armed with a firearm, and that, at the time of the killing [he] believed the circumstances to be such that if they existed would justify or exonerate the killing under the principle [of self-defense], that his belief in this was unreasonable, and constitutes a violation of [second-degree murder statute]." These admissions easily support the finding that he intended to kill Anderson.

Other evidence reinforces that finding. For instance, Jones testified that Council told him that Council and Bush murdered Anderson: Council "grabbed [Anderson], slammed him to the ground and hit him," and then Bush "grabbed him

and slammed him and shot him." Todd testified about several conversations about Anderson he had with Bush. Bush told Todd that Anderson was one of his rivals, because Anderson sold drugs at the Ida B. Wells projects, where Bush also sold drugs. Another time, Todd was sitting in a car with Bush, Council, and Ford, when they saw Anderson walking on the street. Ford suggested that Bush should shoot Anderson, but Bush dismissed the idea because there were pole cameras in the area. In addition, after Anderson shot Bush, Bush told Todd that he had been "stalking" Anderson's prison release date so that he could kill him.

In a recorded conversation, Ford told Todd that one of the Brown twins saw Bush kill Anderson. Kevin Montgomery testified that Bush had told him about the Anderson murder. Bush described how he caught Anderson off guard: he "crept up through the bushes" where Anderson was dancing and "started busting at [him]." When Anderson ran, Council began "busting at him from the other direction."

Anderson's girlfriend confirmed the hostility between Bush and Anderson. She had seen Anderson shoot Bush in the hand. Anderson's brother attended the Robert Taylor reunion party with Anderson. He saw Bush shooting a firearm (although he could not see the intended target), and then he saw Bush and Council run and jump into a vehicle.

Physical evidence also supported these accounts. A baseball hat containing Council's DNA was recovered from the scene. In addition, Anderson's autopsy showed that bullets entered from both his front and back, suggesting multiple shooters.

This evidence amply supports the jury's finding that Bush shot Anderson with the intent to kill him. In any event, an intent to kill is not essential to find a first-degree murder under Illinois law. A person commits first-degree murder if he intends to kill, intends to do great bodily harm to another person, knows that his acts would cause the death of another person, or knows that his acts create a strong probability of death. 720 ILCS 5/9-1. Bush's intentionally shooting at Anderson was enough to allow the jury to find that Bush knew, at a minimum, that his actions created a strong probability of Anderson's death. The evidence of Council's involvement, summarized above, was also sufficient.

Bush and Council also argue that Bush did not kill Anderson for the purpose of maintaining or increasing his position within the Hobos enterprise. See *DeSilva*, 505 F.3d at 715. Instead, they say, the evidence showed that Anderson and Bush had personal animosities dating from an earlier incident in which Anderson shot Bush. They postulate that there was no evidence that the murder was related to the Hobos because Bush was not carrying out an order.

A rational jury, however, could conclude that Bush killed Anderson because Anderson was cutting into his drug sales at the Ida B. Wells Homes, which Bush viewed as Hobos' territory. Drug trafficking was a key source of revenue for the Hobos, and controlling drug lines was crucial to maintaining that income. Ample evidence supported this conclusion. An explicit order is not required for a finding that the crime "was expected of [Bush] by reason of his membership in the enterprise or that he committed it in furtherance of that membership." *Id.*

Last, Council and Bush argue (as they did for Count 2) that Anderson's murder was not cold, calculated, and premeditated. They tactlessly state that "[s]hootings like the Anderson murder occur in Chicago regularly. They involve personal vendettas and crowded areas. There is nothing about this murder that sets it [apart] from such ordinary shootings."

The jury was not required to adopt such a cynical view. Moreover, the government produced evidence allowing the jury to find that Anderson's murder in particular was premeditated. Bush and Anderson had a long-standing dispute over drug territory, and Anderson shot Bush in 2005 as a result of this dispute. Anderson was arrested, and Bush told Todd that he was "stalking" Anderson's prison-release date so that he could kill him. He was a man of his word: Bush seized the opportunity to attack while Anderson was on a weekend pass from a halfway house. Council, Bush, and Ford had also talked about shooting Anderson, but Bush passed over one chance because of the pole cameras in the area. The jury reasonably concluded that Anderson's murder was the result of discussion and planning.

### D.  Counts 4 and 5 – Bluitt's and Neeley's Murders

Derrick argues that there was insufficient evidence to support the jury's guilty verdicts on Counts 4 and 5, which charged him with murdering Bluitt (Count 4) and Neeley (Count 5) in aid of the racketeering enterprise, in violation of 18 U.S.C. § 1959(a)(1). Council, Bush, and Ford join Derrick in arguing that the evidence was also insufficient to support the jury's special findings that their racketeering activity included the commission, or aiding and abetting, of Bluitt's and Neeley's murders.

Derrick concedes that he was present at the funeral when the murders happened, but he denies that he participated in them. The evidence at trial permitted the jury to find otherwise. Cashell Williams, a Fifth Ward BD, testified that he attended the funeral with Bluitt, Neeley, and others. After they paid respects, they got into Bluitt's Range Rover, made a U-turn, and were idling when he heard Bluitt say "it's on." Several cars then drove by, Williams heard gunshots, and Bluitt and Neeley were fatally hit. Williams did not see the shooters, but he saw Ford drive by shortly after the shooting.

In Derrick's recorded conversations with cooperator Johnson, Derrick described the murders. He told Johnson that the murders were meant to retaliate against the BDs for shooting Chester. He identified both the guns that he and Stanley carried and the cars and people involved. He also mentioned that he tried to shoot at Bluitt and Neeley, but his gun jammed.

Jones testified that with Bush, the Vaughn brothers, Council, Ford, and others, he killed Bluitt and Neeley. Council had pulled up to the spot where several Hobos were hanging out and asked them if they had "poles," meaning guns. He told them that he knew where Bluitt was, mentioned the bounty that Chester had placed on Bluitt, and stated that he was "ready to kill for the money." They told a Met Boy to get some guns. Jones gave one to Brown's twin, Brandon, and then got in the car with Council and Brandon. They met up with Bush, Ford, Derrick, and others in an alley. Once Bluitt was in his car, Bush yelled "[g]o, go, go." Council's car was in front, with Brandon in the front seat and Jones in the backseat. Bush was in the second car; Stanley was in the third car; and Ford and Derrick were in the fourth and final car. Jones testified that he saw Derrick shooting from Ford's car. Jones received clothes

from Council as a reward, and Chester later arranged for Dillard to give Jones heroin.

In recorded conversations, Ford told Todd about his participation in the murders. He mentioned that he expected a reward, but Bush got offended because he was "one of the guys." Todd also testified. He stated that in response to Chester's getting shot, he went with Bush to look for and kill Bluitt. Chester offered $20,000 for the kill, but the pair's plan did not work. Todd was out of town when the murders happened, but he discussed them with Bush. Bush said he and other Hobos were in four cars and took turns shooting.

Physical evidence corroborated the testimony. A firearms examiner testified that cartridge casings from the scene were fired by the same gun that was used to kill Daniels. In addition, on the day of the murders, Council changed rental cars twice, before and after the murders. The car he was driving during the murders, a red sedan, was consistent with eyewitness testimony.

Despite all this evidence, Derrick argues that the government relied almost exclusively on the recorded conversations between Derrick and Johnson, and he contends that in these conversations he admitted only his presence, not his participation in the murder. Derrick emphasizes that his gun did not work, and so he could not have participated in the murders. He also asserts that the only other evidence to establish his guilt came from Jones, but he argues that Jones's testimony was "so vague, contradictory, and incredible that it could never be found to support a verdict of guilt beyond a reasonable doubt by any rational jury."

The jury, however, was not required to credit Derrick's assertion that his gun did not work. And even if it did, it could reasonably find that Derrick participated in the murders, without shooting, on an accountability theory. Regardless of whether he fired the gun, Derrick took affirmative steps in furtherance of the murders by conducting surveillance before the murders and serving as back-up. A jury easily could find that he helped the other Hobos kill Bluitt and Neeley. In addition, the jury was entitled to credit Jones's testimony. Once again, any inconsistencies in that testimony were for the jury to resolve. See *Stevenson*, 680 F.3d at 857.

The defendants also contend that the evidence of the Bluitt and Neeley murders was insufficient to support the jury's special findings. Some witnesses did not see Council, Bush, and Ford at the crime scene. Others, who did place them there, allegedly provided inconsistent testimony. And defendants again urge that Todd and Jones were unreliable.

Once again, bearing in mind the standard of review, we find the evidence sufficient to support the findings relating to Council, Bush, and Ford. Jones detailed his cooperation with them to conduct the drive-by shooting. Ford and Derrick implicated themselves in recorded conversations. Bush orchestrated the caravan and yelled "go." Williams testified that he saw Ford during the shooting. This is enough, particularly recalling again that the jury was entitled to make credibility determinations.

Finally, the defendants contend that no jury could find that the Bluitt and Neeley murders were cold, calculated, and premeditated. "At best," they urge, "the evidence provided by the government showed a haphazard and hurried collection of people and resources to quickly confront [Bluitt] and

[Neeley] out on the street." They assert that nothing demonstrated a detailed and organized plan, thoughtfully considered over time, which was executed in cold blood.

If the trial testimony is credited, however, premeditation is clear. A rational jury could reasonably conclude that the Hobos had been planning to murder Bluitt because of the long-running rivalry between the Hobos and BDs. The BDs had shot Chester, and Chester had placed a bounty on Bluitt's head. Bush, Ford, and Todd then devised a plan to kill Bluitt. On the day of the murders, the defendants learned that the BDs were attending the funeral, but they did not act immediately. Instead, Council recruited participants, they gathered weapons, and then they met in an alley where they discussed their plan of attack. Finally, they carried out the plan. This was more than enough to support the jury's finding that the two murders were cold, calculated, and premeditated.

### E.  Shooting of Andre and Darnell Simmons

Bush challenges the jury's special findings that his racketeering activity included the commission, or aiding and abetting, of the attempted first-degree murders of Andre Simmons and Darnell Simmons. Bush argues that the only evidence introduced against him in this respect was the unreliable testimony of cooperator Chad Todd.

At trial, Todd testified that on the day of the shootings, Bush called him and asked to meet at a nearby grocery store. Once Todd arrived, he saw Bush sitting in the driver's seat of a white Impala that was parked on a side street next to the grocery store. Ford was in the front passenger seat, and Council was in the rear passenger seat. Todd got into the car behind Bush. The group sat and waited, watching a black Nissan

Maxima that was parked in the grocery store parking lot. When the Maxima pulled out, they followed it. Todd testified that, at this point, Ford and Bush somehow switched seats, Ford now driving and Bush in the front passenger seat.

After trailing the Maxima for a short time, Todd testified that Bush pulled the sunglasses compartment down, reached in, and pulled out a FN 5.7 firearm. Bush then instructed Ford to lean back, Ford did so (Todd reported to the point of crushing Todd's legs), and Bush fired past Ford's face. Todd said that he saw bullet holes going through the front passenger window and heard glass shattering. Then he heard sirens and saw an unmarked squad car behind them. They briefly eluded the unmarked squad car, but after they got out of their car and ran, Todd and Council were both apprehended and taken into custody.

Bush asks us to find that Todd's testimony is incredible. He emphasizes that Todd did not describe how Ford and Bush switched seats, or how it would even be possible given the sizes of Bush and Ford and the center console in the vehicle. Bush emphasizes that Todd's testimony throughout the trial was riddled with inconsistencies. Todd admitted to lying on earlier occasions to law enforcement. Furthermore, setting aside the sufficiency of the proof that he committed the attempted murders, Bush argues that the government failed to present sufficient evidence showing that his purpose was to maintain or increase his position within the enterprise or that the attempted murders were part of his racketeering activity.

The government counters that Todd's testimony was well-corroborated. Todd testified that a friend of Bush's girlfriend rented the Impala. That friend testified at trial and confirmed that she rented the car for Bush. After the shooting, Bush's

girlfriend told the friend that the car had been stolen, but during a later search of the car, police found documents in Bush's name, as well as Council's and Bush's fingerprints. In addition, the police recovered cartridge casings from the scene. The casings matched the type of gun Todd described in his testimony and also matched the gun that was used in the Jones and Robinson shootings. The officer who arrested Council after the car chase corroborated this portion of Todd's testimony. The Simmonses also both corroborated Todd's account of the shooting at trial. The Simmonses testified that they were in Andre's Nissan in a turn line when they heard multiple gun shots and that Andre ducked down and continued driving, ultimately crashing into a CTA bus stop. Moreover, in secretly recorded conversations between Todd and Ford, Ford discussed the shooting and said that he gave away a leather jacket to a person who helped him flee after they crashed the car. The government finally argues that the jury reasonably found that the murder was part of the racketeering conspiracy because Andre Simmons was Bluitt's friend, and the Hobos were determined to retaliate against New Town BDs.

The evidence relating to the Simmonses' shooting is not the strongest we have ever seen. Nevertheless, the jury was entitled to credit Todd's account, as corroborated by the evidence cited by the government. In any event, the shooting was only one of many predicate acts on Count 1 for which the jury found Bush responsible; it was not the subject of a substantive act. Any error would therefore be harmless.

### F.   Count 6 – Obstruction of Justice

On Count 6, Poe was convicted of obstruction of justice in violation of the "catchall" clause in 18 U.S.C. § 1503, which

provides that a crime occurs when a person "corruptly ... influences, obstructs, or impedes, or endeavors to influence, obstruct, or impede, the due administration of justice…." After he was convicted, Poe moved for acquittal. The district court found that ample evidence supported Poe's guilt, and so it denied his motion.

We already have noted that Council's brother, Keith Daniels, cooperated with law enforcement to make controlled buys of heroin from Chester and Dillard. Recall, too, that after Daniels was relocated for his safety, he testified before the federal grand jury on April 4, 2013. On April 10, Chester was arrested on a criminal complaint charging him with distributing heroin. The supporting affidavit provided to Chester did not name Daniels, but it summarized the controlled transactions and gave specific details about the buys. Chester told arresting agents that he "knew who the informant was" and "all [he] ever did was take [him] under my arm." Another Hobo, Walter Binion, was at the scene when Chester was arrested. He left separately and later "got the paperwork" for Chester's case. That night, Poe cut off his electronic monitoring bracelet.

Two days later, on April 12, Chester spoke to a woman on the phone while he was detained at Kankakee County Jail. The conversation was recorded. Chester told the woman that "[a] motherfucker wore a wire on me in 2011. He was working with the Feds." The following day, Chester spoke to Poe in coded language. They referenced catching someone who would end up dead. Chester told Poe, "They coming with some other shit and god damn it, probably real soon."

On April 14, Daniels was in the passenger seat of a car driven by his girlfriend, Shanice Peatry. Their children were in the back seat. Peatry testified that after she parked the car

in front of their apartment, Poe walked toward them. He began shooting at the driver's seat, but then he turned his aim to Daniels in the passenger seat as he got closer. To try to protect his family from the gunfire, Daniels jumped out of the car. He was knocked over by bullets. Poe walked even closer, stood over Daniels, and then fired additional bullets at him. Peatry testified that Poe's face was covered by something black, but she was able to recognize his eyes, dreadlocks, and his distinctive gait.

After Poe left, Peatry called 911. She knew Poe from previous interactions and identified him repeatedly: in the 911 call, a post-incident photo array, and at trial. She also told the 911 operator that Poe's getaway car was a gold Trailblazer. Some evidence indicated that a second person was driving the car and may also have fired at Daniels.

Surveillance footage corroborated Peatry's testimony. It showed a tan SUV driving in the area of Daniels's apartment at 7:27 and at 7:43 in the evening. Peatry called 911 at 7:44 p.m. A neighbor testified that she heard gunshots and then saw a tan SUV driving away from the scene. At 8:19 p.m., Chester spoke to a woman on the phone, asking if she heard from Poe. She said that she had not, and Chester told her, "He didn't even have to do that." Chester said that it "was crazy" but he "understand[s] too" because it was "[b]etter [to] be safe than sorry." An hour later, Chester spoke to an unidentified man. The man told Chester, that they "got it under control. That's all you need to know." The man also referenced Poe pulling up in a "lil' Trailblazer truck." Chester said, "Played me like a straight bitch," and the man replied, "you know what you got to resort to." After the murder Poe left Chicago, switching

hotels frequently. He also cut his dreadlocks. The FBI arrested him on May 2, 2013.

In addition, the government produced evidence from other sources. FBI Special Agent Bryant Hill testified that, consistent with Peatry's 911 call, he had seen Poe walk with a limp on several occasions. Zentmyer, Poe's cellmate and a jailhouse lawyer, testified that Poe admitted that he killed Daniels because Daniels was going to testify against Chester in a heroin case. Poe said he cut off his electronic monitoring band, went to Dolton, and shot Daniels in front of his kids and girlfriend. Last, the day after the murder Council spoke to his (and Daniels's) mother on the phone. Council's mother told him that Daniels had been killed and Council replied, "[W]hat that boy doin'… he can't do that in the street …I ain't shed a tear."

To sustain a conviction under section 1503's catchall provision, "the government must prove: (1) a judicial proceeding was pending; (2) the defendant knew of the proceeding; and (3) the defendant corruptly intended to impede the administration of that proceeding." *Torzala v. United States*, 545 F.3d 517, 522–23 (7th Cir. 2008). A grand jury investigation can constitute a pending judicial proceeding. *United States v. Aguilar*, 515 U.S. 593, 599 (1995).

Poe argues that there was insufficient evidence that he murdered Daniels. He emphasizes that there was no physical evidence linking him to the murder—no DNA, fingerprints, or trace evidence. Poe also asserts that he did not confess any crimes to Zentmyer. Instead, Zentmyer came up with his story by researching the charges against Poe using publicly available case documents, newspapers, television programs, and Poe's discovery materials. In fact, Poe argues, Zentmyer

claimed that Poe bragged about personally shooting and kill-ing a man in a Range Rover in front of a funeral home. This was a reference to the Bluitt/Neeley murders, but it is undis-puted that Poe was in custody when they occurred.

Realizing that Peatry's testimony stands in his way, Poe attempts to discount her account. Poe contends that Peatry was in a romantic relationship with Arsenio Fitzpatrick and, in the ten days leading up to Daniels's death, she had con-tacted Fitzpatrick more than 1,000 times by call and text. Shortly after Daniels was killed, she deleted all her text and call records from her phone. Peatry's affair and the timing of those deletions, Poe contends, was suspicious. Poe also high-lights the fact that Peatry did not initially tell law enforcement that the shooter was wearing a mask, making them think she could clearly identify the shooter. Moreover, at trial, she tes-tified for the first time that she identified Poe as the shooter based primarily on his gait. She never mentioned this to the police or the grand jury.

Poe tried to point the finger at other possible perpetrators: Ricky Royal and Lamar Murphy. He notes that Royal and Murphy had greater reason to fear Daniels's cooperation than he did. Daniels had never committed any crimes with Poe, but he had committed a home invasion, robbery, and kidnapping with Murphy and Royal. Additionally, Peatry had seen Dan-iels meet with Murphy and Royal while Daniels was cooper-ating. Peatry testified that on the day he was killed, Daniels received a text message from his cousin warning him that two people from "out west" were planning to kill him. Royal and Murphy were from the west side; Poe was not. Poe also argues that in the recorded calls between Chester and the unknown

male, the unknown male was Murphy, indicating his connection to the murder.

Once again, the choice between Poe's version of these events and the government's was for the jury. Its conclusion that Poe killed Daniels was adequately supported by the trial evidence. It was the jury's prerogative to credit both Peatry's and Zentmyer's testimony. Peatry identified Poe in her 911 call and testified that she recognized Poe's eyes, dreadlocks, and gait. Zentmyer added details of the murder that were not in the complaint or the news, such as that Daniels was murdered in Dolton, that Daniels was Council's brother, and that Daniels's girlfriend and children saw the murder. As for the other possible perpetrators, in the recorded jail calls, Chester spoke to a woman, asking for Poe and telling her that "he" "didn't even have to do that," seemingly referring to Poe. In addition, the jury may reasonably have questioned why Poe cut off his electronic monitoring bracelet, fled Chicago, cut his distinctive dreadlocks, and moved from hotel to hotel. Juries are "permitted to consider flight as evidence of consciousness of guilt and thus of guilt itself." *United States v. Starks*, 309 F.3d 1017, 1025 (7th Cir. 2002).

Poe follows up with an attack on the sufficiency of the evidence to show that, in killing Daniels, he intended to obstruct a pending judicial proceeding. This is a more difficult question.

Three judicial proceedings bear on Count 6: the grand jury's investigation into Chester and Dillard; the drug charges that were brought against Chester and Dillard; and the grand jury's RICO investigation. The government argues that there was sufficient evidence that Poe was aware of both Chester's case and the ongoing grand jury investigation.

As evidence that Poe knew about the grand jury's RICO investigation, the government points to the conversation between Chester and Poe in which they talked about "some other shit" coming "real soon." It argues that the jury in the present case could conclude that this statement was a coded reference to the grand jury's proceedings. The government also notes that when Zentmyer was helping Poe with his legal issues, Zentmyer wrote a note asking, "Was confidential source working for state or state prosecution?" Poe crossed out "state" and wrote "federal" and "joined [sic] task, state and federal."

In addition, the government argues, Poe was aware of the more immediate federal drug charges against Chester. Fellow Hobo Binion was present when the FBI arrested Chester, and then there was a lengthy discussion about Daniels and Chester's arrest among the Hobos. Poe absconded the night of Chester's arrest, even though his parole was about to expire, indicating that he learned about the arrest from Binion or another Hobo. And Poe spoke to Chester while he was in custody, confirming that Poe knew Chester had been arrested. Binion went to federal court after the arrest to get copies of the "paperwork" in Chester's case.

In response to all this, Poe admits that he knew that Chester was in jail, but he says that he was unaware of the charges against Chester, let alone that they were federal. With respect to the grand jury investigation, Poe asserts that, at most, he was informed that charges were coming, but that he was unaware of any ongoing federal grand jury investigation.

We agree with Poe that the evidence supporting a finding that he knew about the grand jury's RICO investigation was

weak. Although Poe may have known the FBI was investigating the Hobos as an enterprise, "it is not enough that there be an intent to influence some ancillary proceeding, such as an investigation independent of the court's or grand jury's authority." *Aguilar*, 515 U.S. at 599. It is speculative at best that Poe knew that the investigation had reached the level of a grand jury.

Nevertheless, there was sufficient evidence to allow a rational jury to find that Poe knew about the pending federal drug charges against Chester. Poe spoke to Chester while he was in custody, and so he knew Chester had been arrested. Chester was aware that Daniels had been working with federal agents. In a recorded call before Daniels's murder, he said "A motherfucker wore a wire on me in 2011. He was working with the Feds." A jury could infer other Hobos also knew Daniels was working with federal agents and knew there would be federal charges against Chester. In addition, Zentmyer testified that Poe admitted to killing Daniels because he was going to testify against Chester. When asked why Poe committed the murder, Zentmyer stated: "He said that this guy [Daniels] had made heroin buys off of Bowlegs [Chester]. And that's what Bowlegs was in custody for, and this was the main guy to testify against Bowlegs." This is enough to support the district court's decision to deny Poe's motion for acquittal on Count 6.

### G.  Count 7 – Robbery of Collections store

Count 7 charged Council with aiding and abetting the use, carrying, or brandishing of a firearm during the robbery of the Collections store, in violation of 18 U.S.C. § 924(c). "[T]o convict a defendant of a § 924(c) violation as an accomplice, the government must prove that he had advance knowledge of

his collaborator's plan to use or carry a gun during the commission of the crime." *Farmer v. United States*, 867 F.3d 837, 841 (7th Cir. 2017). Council concedes that he was present during the robbery, but he contends that the government failed to show that he had advance knowledge that his accomplices would use firearms.

This time, we have no trouble finding ample evidence to support the conviction. At trial, Bland testified that he, Ahmad Hicks, and Pierre Skipper were sitting in a vehicle with firearms on their laps, when Council approached them. Council suggested that they rob Collections, and, after they agreed, Council passed out masks and laundry bags. The four of them entered the store together. According to Bland, during the robbery, Hicks had his firearm "upped," meaning it was visible in his hand. Once inside the store, Council and Skipper gathered expensive jackets and other clothes while Hicks and Bland moved the store's employees to a backroom at gunpoint. Store employees testified that as they were moved, they saw a gun in one robber's sleeve and another robber carrying one in his hand.

Council argues that Bland's testimony does not suffice. He emphasizes that Bland testified at trial in order to reduce his sentence and that inconsistencies plagued his testimony. Originally, Bland told law enforcement that he did not know anything about the guns used during the robbery. Then he testified that they were not his guns. Then he testified that the guns belonged to Hicks and Skipper, only later to testify that the guns belonged to Hicks, but that Hicks gave him one gun that he held for a minute and then returned.

In addition to these problems, Council highlights the inconsistencies between Bland's testimony at trial and his testimony before the federal grand jury. Bland told the grand jury that just before the robbery, when Council approached the car, he asked the group if they had weapons on them and they said yes. At trial, however, Bland testified that the guns were already sitting on their laps when Council approached.

These are minor or easily explained discrepancies. Regardless of whether Council asked his coconspirators about guns or merely saw guns on their laps, the evidence showed that he had advance knowledge of the guns. And although Bland's statements about who owned the guns were inconsistent, Council's advance knowledge did not depend on who owned the weapons. More importantly, Bland's testimony about other details, such as the make and model of the guns, was consistent. It was the jury's job to unravel whatever discrepancies or credibility issues Bland presented.

It appears likely that the jury credited Bland's testimony because it was corroborated by the video captured by Collections' security cameras. The footage shows the robbers entering the store and Bland and Hicks carrying guns. The employees were herded to the back of the store while Council was gathering jackets and other clothing items. As the district court noted, "[n]o physical force was used to compel the employees … which is consistent with testimony that guns were used to gain their swift compliance. With such an orderly process, the jury could reasonably infer from the videotape that using guns was part of the plan from the start."

The evidence was therefore sufficient for the jury's guilty verdict on Count 7. Based on the same evidence, we also reject Council's related argument that the evidence failed to support

the jury's special finding that in the course of the robbery he aided and abetted the "brandishing" of a firearm (as opposed to using or carrying one).

We also briefly address, though it is not a sufficiency argument, Council's other challenge to Count 7. The predicate offense for this section 924(c) charge was robbery affecting commerce in violation of 18 U.S.C. § 1951(a) (Hobbs Act robbery). "Robbery" under the Hobbs Act is defined as "the unlawful taking or obtaining of personal property from the person or in the presence of another, against his will, by means of actual or threatened force, or violence, or fear of injury, immediate or future, to his person or property, or property in his custody or possession, or the person or property of a relative or member of his family or of anyone in his company at the time of the taking or obtaining." 18 U.S.C. § 1951(b).

Council contends that Hobbs Act robbery is not a crime of violence under 18 U.S.C. § 924(c)(3)(A) because it is possible to commit this type of robbery without the use or threatened use of force. We have squarely rejected this argument. *United States v. Rivera*, 847 F.3d 847, 849 (7th Cir. 2017) ("Because one cannot commit Hobbs Act robbery without using or threatening physical force, … Hobbs Act robbery qualifies as a predicate for a crime-of-violence conviction."). Alternatively, Council contends that even if Hobbs Act robbery is a crime of violence, an inchoate offense such as aiding and abetting does not qualify as a crime of violence. Again, the rule is otherwise for inchoate offenses. See *Hill v. United States*, 877 F.3d 717, 719 (7th Cir. 2017) (attempted crimes); *United States v. García-Ortiz*, 904 F.3d 102, 109 (1st Cir. 2018) (aiding and abetting); *United States v. Grissom*, 760 F.

App'x 448, 454 (7th Cir. 2019). We thus reject both of these legal challenges to Council's conviction on Count 7.

### H.  Count 9 – Possession with Intent to Distribute

This time we address one of Ford's convictions: one for possession of marijuana with the intent to distribute it, in violation of 21 U.S.C. § 841(a)(1). In February 2013, during a lawful search of Ford's residence, CPD officers found approximately 50 plastic baggies of user quantities of marijuana, totaling 10.6 grams. The baggies were divided among five larger bags, which were, in turn, put into one bag. Two witnesses, an FBI agent (testifying as an expert) and a CPD officer, testified that the marijuana was packaged for distribution.

There are three elements required for a conviction under 21 U.S.C. § 841(a)(1): (1) knowing or intentional possession of a substance with (2) the intent to distribute it, and (3) knowledge that the material is a controlled substance—here, marijuana. *United States v. Campbell*, 534 F.3d 599, 605 (7th Cir. 2008). Ford does not dispute that the baggies of marijuana were his, or that he knew they contained marijuana. He contends only that the evidence of intent to distribute fell short. He emphasizes that the government never detailed whether the 50 baggies contained different quantities of marijuana and whether some were empty. Nor did the government present any evidence of scales, wrappers, or money, items typically surrounding drug dealing.

This evidence permitted the jury to conclude that Ford intended to distribute the marijuana. *United States v. Bernitt*, 392 F.3d 873, 879 (7th Cir. 2004) ("[T]he quantity and packaging of drugs … can be sufficient to support the inference of an in-

tent to distribute."). The FBI agent's expert testimony confirmed that the marijuana was packaged for distribution. And Ford's own statements reinforce the conclusion that he intended to distribute the marijuana. In a recorded conversation between Ford and Todd, Ford stated that although he did not "smoke weed" himself, he was going to get a pound of "kush" (marijuana) to sell once he was released from prison. No more was necessary.

We also briefly comment on Ford's contention that he should not have been tried at all in the case as a whole, because he was not named in the Second Superseding Indictment. Ford was charged in four counts of the Superseding Indictment: Count 1 (racketeering conspiracy), Count 8 (felon in possession of a firearm), Count 9 (possession with intent to distribute marijuana), and Count 10 (possession of a firearm in connection with the marijuana offense). In the same indictment, Ford's co-defendant, Poe, was charged in Count 6 for obstruction of justice.

About one week before trial, Poe moved to dismiss Count 6, on the ground that it failed to allege the obstruction of a specific pending judicial proceeding. The grand jury speedily returned a Second Superseding Indictment against only Poe. The Second Superseding Indictment cured the deficiency Poe had mentioned by alleging the specific judicial proceedings that were obstructed.

During jury selection, Ford's counsel requested clarification of "[w]hat indictment" was the subject of trial. The district court answered that the trial was proceeding on the Superseding Indictment, with the exception of Count 6, as to which Second Superseding Indictment replaced the earlier version of Count 6 with a new Count 6. A week into trial, Ford

asked the district court to dismiss him from the case. He argued that the Second Superseding Indictment nullified the Superseding Indictment and, because he was not named in the Second Superseding Indictment, there were no longer charges pending against him. He argued that the government was required to select only one indictment on which to proceed to trial. The district court denied the motion, rejecting "the premise that a superseding indictment wholly replaces previous ones." Ford now echoes this argument before us.

We are not persuaded. First, Ford's motion came too late, as it is among those that Federal Rule of Criminal Procedure 12(b)(3)(B) requires to be raised before trial. Second, it is not the case that "a superseding indictment zaps an earlier indictment to the end that the earlier indictment somehow vanishes into thin air." *United States v. Bowen*, 946 F.2d 734, 736 (10th Cir. 1991). "An original indictment remains pending prior to trial, even after the filing of a superseding indictment, unless the original indictment is formally dismissed." *United States v. Yielding*, 657 F.3d 688, 703 (8th Cir. 2011). Here, the government did not move to dismiss the Superseding Indictment, and it was entitled to proceed to trial against Ford on it. This objection is meritless.

## III

We now turn to the defendants' challenges to the court's rulings on the admission of evidence.

### A.  Forfeiture by Wrongdoing

Bush, Chester, Council, Ford, and Derrick contend that the admission of Keith Daniels's out-of-court statements pursuant to the forfeiture-by-wrongdoing doctrine violated their Sixth Amendment Confrontation Clause rights. Poe joins this

argument only to the extent that he asserts that the district court erred in requiring the government to prove the elements of forfeiture by wrongdoing only by a preponderance of the evidence. The government argues that Daniels's statements were properly introduced, and even if they were not, any error was harmless. "Where the defendant's Sixth Amendment right to confront witnesses is directly implicated, our review is *de novo*." *United States v. Ochoa*, 229 F.3d 631, 637 (7th Cir. 2000).

The Sixth Amendment's Confrontation Clause provides that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him." U.S. CONST. amend. VI. In 2004, the Supreme Court held that the right to confrontation prohibits "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant ... had a prior opportunity for cross-examination." *Crawford v. Washington*, 541 U.S. 36, 53–54 (2004). Yet *Crawford* permits courts to admit testimonial statements "where an exception to the confrontation right was recognized at the time of the founding." *Giles v. California*, 554 U.S. 353, 357 (2008).

One such exception is common-law forfeiture by wrongdoing. Codified in Federal Rule of Evidence 804(b)(6), the forfeiture-by-wrongdoing doctrine allows testimonial statements to be admitted, even if unconfronted, when the defendant's own conduct caused the declarant to be unavailable at trial. Rule 804(b)(6) describes this as "[a] statement offered against a party that wrongfully caused—or acquiesced in wrongfully causing—the declarant's unavailability as a witness, and did so intending that result." *Giles* requires the gov-

ernment to prove that the defendant's actions were undertaken for the purpose of preventing the witness from testifying. 554 U.S. at 367–68.

At trial, the government sought to admit Daniels's out-of-court statements—his grand jury testimony—against all the defendants, not just against Poe (the person who directly caused Daniels's unavailability by murdering him). It argued that it could do so under the theory of liability recognized in *Pinkerton v. United States,* 328 U.S. 640 (1946). *Pinkerton* provides that a person is liable for an offense committed by a co-conspirator when its commission is reasonably foreseeable to that person and is in furtherance of the conspiracy. *Id.* at 647. According to the government, "[i]t would make little sense to limit forfeiture of a defendant's trial rights to a narrower set of facts than would be sufficient to sustain a conviction and corresponding loss of liberty." *United States v. Cherry*, 217 F.3d 811, 818 (10th Cir. 2000).

The district court agreed with the government, relying on *United States v. Thompson*, 286 F.3d 950 (7th Cir. 2002). In *Thompson*, we stated that under Federal Rule of Evidence 804(b)(6), a defendant who "acquiesces in conduct intended to procure the unavailability of a witness" waives his hearsay objection. *Id.* at 964. We noted that by using the term "acquiesce," the drafters of Rule 804(b)(6) expressed an intent to allow for the imputation of waiver. *Id.* Therefore, "if a murder is reasonably foreseeable to a conspirator and within the scope and in furtherance of the conspiracy, the conspirator waives his right to confront that witness just as if he killed the witness himself." *Id.* at 963. "Without a rule of coconspirator waiver, the majority of the members of a conspiracy could benefit from a few members engaging in misconduct. Such a

result is at odds with the waiver-by-misconduct doctrine's equitable underpinnings." *Id.* at 964.

The defendants, however, argue that the decisions in *Crawford* and *Giles* have undermined *Thompson*'s approach, and that their holdings rule out the use of *Pinkerton* to impute waiver of a defendant's Sixth Amendment right to confrontation under the forfeiture-by-wrongdoing concept. They note, accurately, that courts did not recognize *Pinkerton* liability at common law; from that, they conclude that any exception to the confrontation right based on *Pinkerton* was not recognized at the founding. The defendants also contend that *Pinkerton* is inconsistent with *Giles*'s requirement that forfeiture of confrontation rights occurs only if the *defendant* acts with the specific purpose of precluding the witness's testimony.

Several of our sister circuits have found, post-*Crawford*, that *Pinkerton* liability allows the admission of testimonial statements under a forfeiture-by-wrongdoing theory. They permit the inference of waiver for coconspirators who reasonably could foresee that a fellow conspirator would engage in premeditated murder in furtherance and within the scope of the conspiracy. See *United States v. Cazares*, 788 F.3d 956, 975 (9th Cir. 2015) ("The district court should have articulated that the … murder was within the scope of and in furtherance of the conspiracy, and that the murder was reasonably foreseeable to the defendants other than Martinez and Avila so that the forfeiture by wrongdoing doctrine applied to all who had 'acquiesced in wrongfully causing—the declarant's unavailability.'"); *United States v. Dinkins*, 691 F.3d 358, 386 (4th Cir. 2012) ("We conclude that the district court properly admitted the … hearsay statements against [the defendant who

did not commit the murder] under the forfeiture-by-wrongdoing exception to the Confrontation Clause pursuant to *Pinkerton* principles of conspiratorial liability."); *United States v. Carson*, 455 F.3d 336, 364 (D.C. Cir. 2006) ("[T]he reasons why a defendant forfeits his confrontation rights apply with equal force to a defendant whose coconspirators render the witness unavailable, so long as their misconduct was within the scope of the conspiracy and reasonably foreseeable to the defendant, as it was here."). But these cases do not analyze whether *Pinkerton* liability was recognized at common law, and so we are reluctant to jump onto that bandwagon.

*Pinkerton* itself was not decided until 1946, and it was controversial from the outset. One scholar had this to say about it:

> In the years following *Pinkerton*, the decision was almost universally condemned by the academic community. And, although no statistics exist, *Pinkerton* liability appears to have been rarely utilized until the 1970's. Indeed, in 1962 the drafters of the Modal Penal Code rejected *Pinkerton* liability and by 1972, LaFave and Scott's influential *Handbook on Criminal Law* declared that the *Pinkerton* rule had never gained broad acceptance.

Alex Kreit, *Vicarious Criminal Liability and the Constitutional Dimensions of* Pinkerton, 57 AM. U. L. REV. 585, 597–98 (2008) (quotation marks and citations omitted). Rule 804(b)(6) was codified in 1997, long after the ratification of the Sixth Amendment in 1791. In the 18th century, criminal liability was generally limited to those who acted as principals or those who aided and abetted. Under a strict reading of *Crawford* and *Giles*, it seems that *Thompson* may no longer be good law.

This is an important question, but it is one that we can save for another day. Our problem is a simple one: was one conspirator acting as the agent for the others, while acting within the scope of the conspiracy? If yes, then ordinary agency principles suggest that the act can be attributed to all of them. Moreover, we are confident that any error in admitting Daniels's out-of-court statements was harmless. "[C]onstitutional error that is harmless will not cause an otherwise valid conviction to be set aside. … The test is whether the reviewing court can determine beyond a reasonable doubt that the error did not contribute to the verdict." *Ochoa*, 229 F.3d at 639–40 (internal citation omitted).

The statements at issue came from Daniels's grand jury testimony. The defendants objected to the admissibility of certain passages on various grounds, such as a failure to indicate the basis of Daniels's personal knowledge. The district court conducted a line-by-line review, excised substantial portions of the testimony, and admitted the remainder.

The jury heard that Daniels testified before the grand jury on April 4, 2013, and offered the following information. Council is his older brother. Daniels was familiar with the Hobos through Council and others. Chester was the leader of the Hobos, and Council, Poe, Bush, and Ford were members. The Hobos had a hand sign, and "Hobo" was stitched on some members' cars' headrests. Council sold drugs in the Robert Taylor Homes, and Bush and Stanley also sold drugs.

Daniels also mentioned robberies and rivalries. He stated that the Hobos committed robberies together. Daniels himself participated in one that Chester had arranged. Afterwards, Chester took some of the proceeds. On another occasion, Chester told Daniels he was planning a robbery. Daniels also

saw Chester with $100,000 cash. As for gang rivalries, Daniels identified the Hobos' conflict with the Met Boys, which started when Jones stole marijuana and was shot. The Hobos also had a feud with the Mickey Cobras.

Daniels also testified that he accompanied Chester when he bought a loaded firearm for Poe, and Chester told him that Chester was trying to get as many guns as possible. Poe told Daniels he planned to kill a BD, and Ford told Daniels he and Brandon Brown were part of the group that shot up the funeral home. Daniels discussed his drug transactions with Chester and Dillard.

Overall, what remained after the district court's redactions was information that was largely duplicated by other witnesses. Daniels's grand jury statements provided general information about the Hobos and their criminal activity. There is no meaningful chance that they contributed to the jury's verdict. Our finding that any error that may have occurred in their admission was harmless makes it unnecessary for us to address some related arguments, namely, whether the court erred in applying a preponderance of the evidence standard to the elements of forfeiture by wrongdoing, or whether there was insufficient evidence to establish that Chester participated in or conspired to murder Daniels in order to prevent his testimony at trial.

## B. Guilty Pleas

Bush, Chester, Council, Ford, Poe, and Derrick argue that the district court should not have admitted their guilty pleas to underlying racketeering activity (such as murders, robberies, and narcotics activity) that was part of the enterprise and for which defendants were prosecuted in state court. In

allowing the evidence, the court relied on the dual-sovereign doctrine, which permits the federal government to prosecute a defendant under a federal statute even if a state has prosecuted him for the same conduct under state law. The defendants ask us to overrule the dual-sovereign doctrine, arguing that it violates the Double Jeopardy Clause of the Fifth Amendment.

Their effort to preserve this issue for possible Supreme Court review made sense at the time, but events have outstripped them. After the defendants filed their briefs, the Supreme Court addressed dual sovereignty and held that the doctrine is consistent with the text of the Fifth Amendment, its history, and "a chain of precedent linking dozens of cases over 170 years." *Gamble v. United States*, 139 S. Ct. 1960, 1962–69 (2019). The district court acted properly in admitting the guilty pleas.

### C.  Toolmark Analysis

Bush, Chester, Council, Ford, Poe, and Derrick argue that the district court improperly admitted expert testimony on toolmark analysis, allowing them to argue that "these seemingly unrelated crimes were committed by the same group of people." At trial, the government called four firearms experts: Illinois State Police firearms examiners Marc Pomerance, Kurt Murray, and Aimee Stevens, and a scientist with the FBI's Firearms-Toolmarks Unit, Rodney Jiggets. Notably, the defendants do not challenge the qualifications of any of these four experts. Rather, the defendants challenge only the reliability of toolmark analysis as a discipline for expert testimony.

Pomerance testified that toolmark analysis, a discipline within the forensic sciences, is used to determine whether a

bullet or casing was fired from a particular firearm. It can also be used to determine whether two bullets or casings were fired from the same firearm. An examiner can make these determinations by looking through a microscope to see markings that are imprinted on the bullet or casing by the firearm during the firing process. Firing pins impart marks, and scratches are made as the bullet travels down the barrel.

These markings are either (1) "class characteristics," which are features that a group shares, (2) "sub-class characteristics," which are shared by a subset of items, or (3) "individual characteristics," which are microscopic imperfections on the surface of the object that are unique to a particular firearm. Firearms examiners can conclude that two items, such as casings, were fired from the same firearm when the class and individual characteristics of two items, such as casings, match.

Pomerance examined 9mm cartridge casings that were recovered from the area where Cordale Hampton and his uncle were shot. He compared them to 9mm cartridge casings from an October 2005 shooting. The individual characteristics were the same on both, and so he determined that they were fired by the same firearm. Pomerance also compared a 5.7 x 28mm cartridge casing from the Eddie Jones shooting to a 5.7 x 28mm cartridge casing from the Simmons shooting. The markings matched.

Murray found a match between 5.7 x 28mm casings from the Jonte Robinson shooting and comparable casings from the Simmons shooting. Murray also found that a FN firearm seized from Bush's storage locker fired the cartridge casings from the Eddie Jones shooting. Stevens found a match between .40 caliber cartridge casing from the Wilber Moore murder and the same type from the October 2005 shooting.

Jiggets testified that the .45 caliber cartridge casings recovered from the Bluitt/Neeley murder scene matched casings found at the Daniels murder scene. In response, the defense called a forensic metallurgist, William Tobin, who testified that toolmark identification lacks scientific foundation.

The defendants argue that the district court erred in denying their motions to exclude this toolmark evidence on reliability grounds. Federal Rule of Evidence 702 governs the admissibility of expert testimony. Under Rule 702, if "scientific, technical, or other specialized knowledge will help the trier of fact," then "a witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion … ."

A district court "holds broad discretion in its gatekeeper function of determining the relevance and reliability of the expert opinion testimony." *Krik v. Exxon Mobil Corp.*, 870 F.3d 669, 674 (7th Cir. 2017). We use a two-step standard of review where a defendant challenges a district court's admission of expert testimony. *United States v. Johnson*, 916 F.3d 579, 586 (7th Cir. 2019). First, we consider *de novo* whether the district court properly applied the Rule's framework. If so, we review the ultimate decision to admit or exclude the evidence only for abuse of discretion, understanding that the district court abuses its discretion only when no reasonable person could take the court's view. *Id.* at 586–87.

Although it is hard to show abuse of discretion, the defendants urge that it occurred in this instance when the district court found that the toolmark analysis is sufficiently reliable. They assert that the "premise underlying the field of firearms analysis—that no two firearms will produce the same microscopic features on bullets and cartridge cases—[i]s, at

best, an unproven hypothesis." They also complain that there are no objective, quantitative standards for determining whether two ammunition components "match."

The defendants' argument has respectable grounding. It is based largely on a report issued by the President's Council of Advisors on Science and Technology (PCAST). The report states that the "foundational validity can *only* be established through multiple independent black box studies," and it identifies only one such study, the Ames Study. According to PCAST, the other available studies could not estimate the reliability of firearms analysis because they employed "artificial designs that differ[ed] in important ways from the problems faced in casework," which "seriously underestimate[d] the false positive [match] rate." Ultimately, the PCAST report found that firearms analysis "[fell] short of the criteria for foundational validity." The defendants also emphasize that even the Ames Study had not been published or subject to peer-review at the time of trial. Moreover, they contend, the government's experts misled the jury by testifying about the Ames Study's error rate, because that rate is not representative of the "entire discipline of firearms analysis."

The defendants brought the PCAST report to the district court's attention, but the district court chose not to give it dispositive effect, and that choice was within its set of options. See *General Electric Corp. v. Joiner*, 522 U.S. 136, 142–43 (1997) (appellate review of expert-evidence rulings is only for abuse of discretion). Rule 702(c) requires testimony to be "the product of reliable principles and methods." Courts frequently look to *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), which the Rule largely reflects, to assess that point. Under *Daubert*, to determine reliability, a court considers

whether the theory or technique has been (1) tested, (2) subjected to peer review and publication, (3) analyzed for known or potential error rate, and (4) generally accepted within the specific scientific field. *Daubert*, 509 U.S. at 592–94.

Taking these criteria into account, the district court found the toolmark evidence was admissible. It noted that the Association of Firearms and Toolmark Examiners (AFTE) methodology used by the government's witnesses had been "almost uniformly accepted by federal courts." See, *e.g.*, *Cazares*, 788 F.3d at 989. The AFTE method has been tested and subjected to peer review. Three different peer-reviewed journals address the AFTE method, and several reliability studies have been conducted on it. Although the error rate of this method varies slightly from study to study, overall it is low—in the single digits—and as the district court observed, sometimes better than algorithms developed by scientists. The court also noted that firearm and toolmark analysis is widely accepted beyond the judicial system.

The district court used the methodology prescribed by the Rule, and we see no abuse of discretion in its application of these principles. Almost all the defendants' contentions were issues that could be raised on cross-examination. These arguments go to the weight of the evidence, not its admissibility. Expert testimony is still testimony, not irrefutable fact, and its ultimate persuasive power is for the jury to decide.

### D. Recorded Conversations

Chester, Council, Bush, Poe, Ford, and Derrick argue that the district court erred in admitting Jodale Ford's recorded

conversations. Again, we review this ruling for abuse of discretion. *United States v. McGee*, 408 F.3d 966, 981 (7th Cir. 2005).

At trial, Chester called Jodale Ford (to whom we refer as "Jodale" to avoid confusing him with his brother, defendant William Ford) as a witness. Jodale was then in state custody for murder and home invasion. Jodale contradicted most of the elements of the government's case. He testified that he did not rob a jewelry store with Chester, that there was no Hobos gang, and that he was not a leader of the Hobos. On cross-examination, Jodale testified that, while in prison, he did not receive updates about the defendants and did not send letters to Council. He also denied remembering anything about Daniels's murder or receiving money from the Hobos while in prison.

In rebuttal, the government sought to introduce some of Jodale's jail calls. In these conversations, Jodale asked for updates on some members of the Hobos and identified himself as "Hobo." Callers also gave Jodale information about the Daniels murder.

The defense objected, arguing that they needed to confront Jodale with the calls before they could be introduced as prior inconsistent *statements* under Federal Rule of Evidence 613, which states: "Extrinsic evidence of a witness's prior inconsistent statement is admissible only if the witness is given an opportunity to explain or deny the statement and an adverse party is given an opportunity to examine the witness about it, or if justice so requires." Fed. R. Evid. 613(b). The government responded that it was not introducing the calls under Rule 613.

Instead, it said, it was planning to introduce the calls un-
der Rule 608(b), which governs extrinsic evidence of *conduct*.
Rule 608(b) forbids the use of such evidence to attack a wit-
ness's character for truthfulness, but it allows its admission
on cross-examination if the conduct "[is] probative of the
character [of the witness] for truthfulness or untruthfulness."
The government argued that Jodale's phone calls, *i.e.*, his
prior conduct, was evidence that contradicted his testimony
that he had no relationship to the Hobos.

We have explained the difference between Rules 608(b)
and 613 this way:

> In our view, Rule 613(b) applies when two statements,
> one made at trial and one made previously, are irrec-
> oncilably at odds. In such an event, the cross-examiner
> is permitted to show the discrepancy by extrinsic evi-
> dence if necessary—not to demonstrate which of the
> two is true but, rather, to show that the two do not jibe
> (thus calling the declarant's credibility into question).
> In short, comparison and contradiction are the hall-
> marks of Rule 613(b)….In contrast, Rule 608(b) ad-
> dresses situations in which a witness' prior activity,
> whether exemplified by conduct or by a statement, in
> and of itself casts significant doubt upon his verac-
> ity….So viewed, Rule 608(b) applies to a statement, as
> long as the statement in and of itself stands as an inde-
> pendent means of impeachment without any need to
> compare it to contradictory trial testimony.

*McGee*, 408 F.3d at 982 (quoting *United States v. Winchenbach*,
197 F.3d 548, 558 (1st Cir. 1999)). Here, no comparisons are
necessary. The calls themselves cast doubt on Jodale's testi-
mony. Jodale testified that he knew nothing about the Hobos

and that he did not receive updates on them while incarcerated. Yet the calls show Jodale engaging in conduct that demonstrates his leadership within the Hobos, including receiving updates on the Hobos and giving directions. At any rate, any error in admitting the calls was harmless. *United States v. Olano*, 507 U.S. 725, 734 (1993). The calls were only a small part of the evidence presented, and, quite frankly, we suspect that it would have been more prejudicial if Jodale had been required to explain the calls under Rule 613(b).

## E. Chester's Motion to Suppress

Chester argues that the district court erroneously admitted statements he made on October 22, 2008, when the police stopped a car in which he was a passenger, took him to the station, and questioned him. He argues that the officers who stopped him did not have probable cause.

On June 26, 2008, the FBI and CPD executed a search of an apartment at 1221 North Dearborn Street in Chicago, pursuant to a search warrant. The officers found 99.6 grams of heroin. Four months later, on October 22, some of the officers who had been involved in the Dearborn search headed to Shark's Fish & Chicken. When Binion and Chester's vehicle pulled out of the restaurant's parking lot, the officers stopped it, took Chester to a CPD facility, and interviewed him. After Chester waived his *Miranda* rights, he made incriminating statements.

Before trial, Chester moved to suppress his October 22 statements, arguing that they were the result of an illegal detention that was not supported by probable cause. The district court held a suppression hearing in June 2016 to explore the issue. Both Chester and Binion testified. They stated that they

were pulled over, handcuffed, and transported to the police station involuntarily. Officer Sanchez testified about the stop, and both Sanchez and Agent Hill testified about the interview that followed. Sanchez's testimony was riddled with inconsistencies. As one example, Sanchez provided inconsistent testimony about what led officers to Shark's Fish. Originally, he stated that Agent Hill had received a tip that Chester was engaging in criminal activity there. Later, after reviewing a CPD report, he stated that he had actually been the one to receive the tip.

As a result, the government filed a post-hearing brief in which it abandoned any attempt to justify the stop based on Sanchez's testimony. Instead, it argued that, regardless of any subjective reasons for stopping Chester, the *October* stop was lawful because it was supported by probable cause to believe that Chester unlawfully possessed heroin on *June* 22, 2008. The district court agreed that the heroin found during the Dearborn search provided probable cause to detain and question Chester on October 22 and denied Chester's motion to suppress.

At trial the jury thus heard Chester's incriminating statements. During the interview, Chester had told officers that he was the Hobos' most successful drug dealer and that he robbed drug dealers with other Hobos. Chester was shown photographs of the seized heroin, and he did not deny that it was his. Chester had also offered to cooperate with law enforcement, but he refused to testify publicly.

"Probable cause to make an arrest exists when a reasonable person confronted with the sum total of the facts known to the officer at the time of the arrest would conclude that the

person arrested has committed … a crime." *Venson v. Altamirano*, 749 F.3d 641, 649 (7th Cir. 2014). Contrary to Chester's contentions, it does not matter whether the officers who stopped him did so with the intent of arresting him for the heroin found months earlier during the Dearborn apartment search. The officers' subjective intentions are irrelevant so long as there was probable cause to detain him for any crime. See *Devenpeck v. Alford*, 543 U.S. 146, 154–55 (2004). "What matters, and all that matters, is whether the facts known to the arresting officers at the time they acted supported probable cause to arrest." *White v. Hefel*, 875 F.3d 350, 357 (7th Cir. 2017). Here, the fact was that Chester had possessed almost 100 grams of heroin. This supplied probable cause to arrest him. While some time had passed since the search and the arrest, that "does not necessarily dissipate the probable cause for an arrest." *United States v. Haldorson*, 941 F.3d 284, 291 (7th Cir. 2019).

Chester argues that the police, particularly Officer Sanchez, did not have enough information to link the drugs found at the Dearborn address to him. But there was evidence connecting him to the apartment. The search was based on information provided by Todd, who stated that he had seen Chester with a gun in the apartment. Surveillance officers saw Chester enter and exit the Dearborn apartment building, and women who were present during the search identified Chester as the apartment's resident. As for Sanchez's knowledge specifically, the government contends that collective knowledge of CPD, the agency he works for, is imputed to him.

At oral argument, we were concerned with a different aspect of what the arresting officers, particularly those who

stopped Binion's car, knew before they make the stop: how did they know that Chester was a passenger in the car? Sanchez had testified about this aspect of the stop, but the district court totally rejected his testimony as unreliable, and the government concedes we cannot rely on him. We therefore asked the parties to submit post-argument letters under Federal Rule of Appellate Procedure 28 addressing the question whether Detective Brogan, one of the officers involved in stopping the car, covered this base.

The short answer is that he offered no such testimony at the suppression hearing. He did, however, testify at trial that he saw Chester in a Nissan's passenger seat. The Nissan was initially parked in a parking lot, before it left and was then stopped by officers. The government asserts that we "may consider trial testimony in reviewing a pretrial suppression ruling." *United States v. Howell*, 958 F.3d 589, 596 (7th Cir. 2020). Chester begs to differ and points out that in any event, Detective Brogan's testimony about whether he identified Chester before the detention of Binion's automobile was ambiguous at best. Moreover, he argues, "it simply does not matter if Officer [B]rogan happened to identify Mr. Chester before the stop," because there is no evidence he communicated such information to the arresting officer.

The circumstances surrounding the stop of the car are unclear. We ultimately need not wade through the evidence, however, because any error in admitting Chester's October 22 statements was harmless. "The test for harmless error is whether, in the mind of the average juror, the prosecution's case would have been 'significantly less persuasive' had the improper evidence been excluded." *United States v. Emerson*, 501 F.3d 804, 813 (7th Cir. 2007). This trial lasted over four

months, and the evidence of Chester's guilt on Count 1 was overwhelming. The evidence included Jones's testimony that Chester was the leader of the Hobos and that Chester ordered other Hobos to distribute drugs. Todd testified about Chester's role as a heroin supplier. Recorded conversations of Ford revealed Chester's role in the Hobos and certain robberies he committed. Jail calls also linked Chester to the Daniels murder. This is only some of the relevant evidence. Although a person's own admissions may be powerful in front of a jury, there was too much other evidence to find that the prosecution's case would have been significantly less persuasive had Chester's October 22 statements been excluded.

### F.  In-Court Identifications of Derrick Vaughn

Derrick argues that it was prosecutorial misconduct to ask two government witnesses to identify him in court in the presence of the jury. He did not object to the prosecutor's statements at trial, however, and so we review his claim of prosecutorial misconduct for plain error. *Rosales-Mireles v. United States*, 138 S. Ct. 1897 (2018). In order to establish plain error, a defendant must show (1) "an error that has not been intentionally relinquished or abandoned;" (2) that was "clear or obvious;" (3) that "affected the defendant's substantial rights," meaning that there is a "reasonable probability that but for the error, the outcome of the proceeding would have been different;" and (4) that "seriously affect[ed] the fairness, integrity, or public reputation of the judicial proceedings." *Id.* at 1904–05 (internal citations and quotation marks omitted).

At trial Detective Brogan testified about the joint federal and state investigation of the Hobos. He described his participation in the execution of a search warrant at a residence associated with Bush. During this testimony, Brogan was

handed a photograph that had been confiscated during the search. The government asked Brogan to identify the people in the photo. After identifying Poe both in the photo and in court, Brogan identified Stanley. The government asked if Stanley had a younger brother. Brogan replied that he has two younger brothers, Ingemar Vaughn and Derrick. The government asked Brogan to point out Derrick in court. Brogan did so without a peep from the defense. The government then asked Brogan to identify three additional defendants (Bush, Chester, and Council) in the photograph and in court.

Maurice Perry, a Fifth Ward BD, was the second witness to identify Derrick. He testified about the rivalry between the Fifth Ward and the Dirty Low and mentioned that Stanley was associated with the Dirty Low. Perry was asked if Stanley had any brothers. Perry replied that he had two: "Boo [Ingemar] and D-Block [Derrick]." Derrick stipulated to the in-court identification that followed.

Derrick complains that these witnesses identified him as Stanley's younger brother and then gave additional testimony regarding events—including a double murder in Perry's case—without ever mentioning Derrick again. He contends that these identifications were extremely prejudicial in that they encouraged the jury to find him guilty by association.

We are not convinced that there was any prosecutorial misconduct here. In any event, Derrick failed to establish that any error affected his substantial rights. *Rosales-Mireles*, 138 S. Ct. at 1905. Derrick concedes that the in-court identifications were accurate. In addition, the identifications were only a small part of a four-month trial. The jury heard plenty of evidence of his guilt beyond his familial association to the Hobos. Moreover, the court instructed the jury that a defendant

is "not a member of a conspiracy just because he knew and/or associated with people who were involved in a conspiracy," lessening the risk of potential prejudice. *Cf. Zafiro v. United States*, 506 U.S. 534, 539 (1993) ("[L]imiting instructions … often will suffice to cure any risk of prejudice.").

### IV

We now turn to sentencing, where we review claims of procedural error *de novo*, *United States v. Gill*, 889 F.3d 373, 377 (7th Cir. 2018), and those about substantive reasonableness for abuse of discretion. *Id.* at 378.

### A.  Life Sentence Eligibility

Chester, Council, Bush, Ford, Poe, and Derrick argue that the district court erred in sentencing them to more than 20 years in prison on Count 1 (RICO conspiracy). Chester was sentenced to 40 years and the other trial defendants were sentenced to life. They contend that these sentences were improper because the statutory maximum penalty that may be imposed upon a defendant found guilty of RICO conspiracies is 20 years unless the government proves the "violation is based on a racketeering activity for which the maximum penalty includes life imprisonment." 18 U.S.C. § 1963(a). They argue the government did not meet this burden.

These defendants' violations were based on their participation in murders in Illinois. As we noted briefly earlier, under Illinois law first-degree murder is normally punishable by a 20- to 60- year sentence. 720 ILCS 5/9-1(a); 730 ILCS 5/5-4.5-20(a). A life sentence is permissible, however, when aggravating factors are present. Two aggravating factors are relevant here: (1) where the murder was "… with intent to prevent the murdered individual from testifying or participating in any

criminal investigation or prosecution…," 720 ILCS 5/9-1(b)(8), and (2) where the murder was "committed in a cold, calculated and premeditated manner pursuant to a preconceived plan, scheme or design to take a human life by unlawful means, and the conduct of the defendant created a reasonable expectation that the death of a human being would result therefrom." 720 ILCS 5/9-1(b)(11).

The jury found that the murders of Bluitt, Neeley, Daniels, Moore, and Anderson qualified as aggravating under at least one of those two provisions. It also found that each defendant's racketeering activity included at least one aggravated first-degree murder. The district court therefore determined that the defendants were eligible for life imprisonment.

The defendants disagree. They argue that 18 U.S.C. § 1962(d) criminalizes the agreement to commit an act, not the act itself. Looking for some symmetry, they contend that the proper analogous state-law offense is conspiracy to commit murder. Unfortunately for the defendants, however, section 1963 requires that the "violation"—in this case, the conspiracy—be "based on a racketeering activity for which the maximum penalty includes life imprisonment." The defendants' conspiracies were all *based on* murders for which the maximum penalty includes life imprisonment.

The defendants also argue that the "categorical approach" in *Mathis v. United States*, 136 S. Ct. 2243 (2016), ought to apply in a RICO prosecution. This would require us to discern a "generic" definition of RICO's predicate offenses and then to limit the government to generic murder, rendering life imprisonment unavailable under Illinois law. This argument is not consistent with the text of the statute. Section 1963 con-

templates a statutory enhancement when qualifying circumstances exist. See *United States v. Warneke*, 310 F.3d 542, 549–50 (7th Cir. 2002) (affirming life sentences for RICO conspiracy based on Illinois aggravated murder predicate).

Next, the defendants argue that their enhanced sentences were based on allegations not presented to, or found by, the grand jury, in violation of the Presentment Clause of the Fifth Amendment. U.S. CONST. amend. V. They add that the statutory enhancement is impermissible because the facts increasing the statutory maximum were not alleged in the indictment and proven beyond a reasonable doubt at trial, as required by *Apprendi v. New Jersey*, 530 U.S. 466 (2000).

An example helps to illustrate this argument. Count 1 charged the defendants with RICO conspiracy. It alleged that the defendants engaged in murder and attempted murder in violation of Illinois law. Paragraphs 8(r) and (s) specified seven murders and five attempted murders that were committed in aid of the enterprise. For instance, Paragraph 8(r)(i) alleged that the "murders committed by members and associates of the enterprise in the conduct of the affairs of the enterprise" included "[t]he murder of Wilbert Moore by ARNOLD COUNCIL and PARIS POE." The Notice of Special Findings alleged that each of the murders identified in Paragraphs 8(r)(i)-(iv) and 8(r)(vii) was committed in a cold, calculated, and premeditated manner pursuant to a preconceived plan. The Notice of Special Findings also alleged that Moore and Daniels were murdered to prevent their testimony or because they gave material assistance to law enforcement. The Special Findings, to the extent the jury made them, would make defendants eligible for enhanced penalties. Using this example, the defendants argue that only Council and Poe had notice

that the jury could return a Special Finding against them, because they were the "named defendants."

We are not persuaded. In the example, every defendant was placed on notice that the murder of Moore was committed by Council and Poe to prevent his testimony, or because he gave material assistance to law enforcement. Although Council and Poe were the only "named defendants," the other defendants were placed on notice that the conspiracy—the RICO violation—was based upon racketeering activity (Moore's murder) for which the maximum penalty includes life imprisonment. The indictment's identification in Paragraph 8(r) of specific coconspirators who committed particular murders does not affect the potential coconspirator liability of the remaining defendants.

Chester individually argues that the government constructively amended the superseding indictment by improperly shifting from a solicitation theory to coconspirator liability. At trial, the government argued that Chester's racketeering activity included Bluitt's murder under a *Pinkerton* theory of liability. *Pinkerton* liability need not be specifically alleged in an indictment, and so there was no constructive amendment.

## B. Chester's Sentence

Recall that Chester faced federal drug charges stemming from Daniels's controlled heroin buys. In that heroin case, (No. 13 CR 288 in the district court), Chester was convicted at trial of two counts: (1) conspiracy to distribute and (2) knowingly and intentionally distributing heroin. In July 2014 the Probation Officer prepared a Presentence Investigation Report ("PSR"). The PSR listed Chester's offense level as 26 and

his criminal history category as III, resulting in a Guidelines range of 78 to 97 months' imprisonment. After the PSR was submitted, the parties agreed to continue the heroin sentencing until the conclusion of the RICO trial. The parties later agreed that the heroin case would be transferred to Judge Tharp, who was presiding over the RICO trial, No. 13 CR 774, for joint resolution.

On August 4, 2017, the district court conducted a joint sentencing hearing for all defendants to calculate their offense levels under the Sentencing Guidelines. For Chester, it determined that his racketeering activity resulted in an offense level of 51, reduced to 43 (the top level) and that his Guidelines range and statutory maximum for the racketeering offense was life imprisonment. The court did not explicitly calculate the Guidelines range for Chester's heroin case.

Six days later, on August 10, the court conducted Chester's sentencing hearing. It imposed a below-Guidelines sentence of 40 years' imprisonment in the racketeering case. In the heroin case, the district court imposed a term of 20 years for each of the two counts, which were to run consecutively to each other and concurrently to the term of 40 years in the racketeering case.

Chester argues that the district court's imposition of a sentence so far above the recommended Guidelines range in the heroin case, without comment or explanation, was both procedurally and substantively unreasonable. At sentencing, district courts must calculate the Guidelines range, give the defendant an opportunity to identify section 3553(a) factors that might warrant a non-Guidelines sentence, and explain its sentence in relation to the section 3553(a) factors. *United States v.*

*Gall*, 552 U.S. 38, 49–50 (2007); *United States v. Dorsey*, 829 F.3d 831, 836–37 (7th Cir. 2016).

The district court did not follow those steps for the heroin case. This was plain error, especially considering that the size of the departure from the recommended Guidelines range and the lack of explanation. The government contends that the court "dedicated almost 30 pages of transcript to explaining why a 40-year sentence was necessary and appropriate." But this explanation was focused on the racketeering conspiracy. The government also argues that any error in sentencing Chester in the heroin case was harmless because the sentence added no additional time: it was concurrent to the 40 years' imprisonment on the racketeering count. But this rationale overlooks possible future developments. Suppose that Congress passes a retroactive statute that caps RICO conspiracy sentences at 30 years. That may seem unlikely now, but Congress has passed other retroactive sentencing laws such as the Fair Sentencing Act. Such a law would leave the 40-year heroin sentence untouched. We therefore vacate Chester's sentence in the heroin case, No. 13 CR 288, and remand for further proceedings consistent with this opinion.

### C.  Stanley Vaughn's Sentence

Stanley was one of the few defendants who chose not to go to trial. After he pleaded guilty to Count 1, the RICO conspiracy, his case was severed from that of his co-defendants. The government elected not to seek an enhanced statutory sentence, and so Stanley proceeded directly to sentencing.

On June 29, 2017, the Probation Officer prepared a PSR. In calculating Stanley's offense level, Probation took the position that his racketeering activity included participation in (1) the

Bluitt/Neeley murders; (2) the attempted murders of Jonte Robinson, Cashell Williams, and Roosevelt Walker; and (3) drug trafficking. Each of these was treated as a separate group under Guideline § 3D1.1. The PSR calculated a total offense level of 45, reduced to 43 pursuant to Guideline § 4B1.3. Stanley had a criminal history category of VI, resulting in a Guidelines "range" of life imprisonment. This was reduced to 20 years to reflect the statutory maximum.

At his sentencing hearing, Stanley objected to the determination that his racketeering activity included the murders, attempted murders, and drug trafficking mentioned in his PSR. The court overruled his objections, based largely on the evidence presented at his co-defendants' trial for the Bluitt/Neeley murders. This evidence established that Stanley "participate[d] in this ambush." Although there were some inconsistencies in the details, the court found no reason to discredit "the much larger and much more significant consistencies in the evidence about how this transpired," particularly considering the ambush's quick nature. Recorded statements of Derrick, Stanley's brother, implicated Stanley. Ford and Jones also placed Stanley within the caravan that ambushed Bluitt and Neeley.

As for the drug trafficking, the court looked to Todd's and Jones's testimony and Ford's proffer and found that Stanley "manag[ed] drug lines at 47th and Vincennes." It noted that Stanley was "the leader of the effort to drive the Black Disciples out of this area and to take it over for the Hobos," referring to an altercation between Stanley and the BDs. The court also concluded that the evidence was sufficient for the attempted murders. To each racketeering act, it added an obstruction enhancement that increased the proposed offense

level by two levels. With grouping, the combined adjusted offense level was 49, reduced to 43. This again resulted in a Guidelines range of life; that in turn was reduced to the 20-year statutory maximum.

On August 10, 2017, the court held a second sentencing hearing to consider the section 3553(a) factors. Stanley and the government both argued for a 20-year sentence. They disputed, however, whether it should run consecutively or partially concurrently to an undischarged sentence that Stanley was serving based on a conviction in the Central District of Illinois. That conviction, which carried a 262-month sentence, was based on Stanley's distribution of heroin in Springfield.

The court held that the Springfield drug trade was relevant conduct in the racketeering case, but it decided to run Stanley's 20-year sentence for the latter consecutively to the Springfield term. It explained that it was necessary to account for the violent activity and "personal participation in murders and attempted murders" that were part of the racketeering case. The Springfield drug trafficking, the court thought, "pale[d] in significance to the conduct" in which the Hobos enterprise engaged. While there was "some overlap," it said, the racketeering case "concerns a far broader and more serious range of conduct than was at issue in the Central District case." Moreover, it noted that Stanley had a lengthy criminal record and "has had a second chance, a third, fourth, fifth, sixth, seventh chance. At each opportunity that has been presented to him to put his criminal conduct behind him, he has instead concluded to escalate his criminal conduct … ."

Stanley raises two arguments on appeal: first, he accuses the district court of relying on unreliable trial evidence to cal-

culate his offense level; and second, he contends that the evidence underlying the district court's determination that his racketeering activity included the murders and attempted murders was incredible and full of inconsistences. These make essentially the same point, and so we treat them together.

With respect to the Bluitt/Neeley murders, Jones testified that Stanley was in the third car of the four-car caravan, but Derrick told Johnson that Stanley was in the first car. Ford's proffer suggested yet a different lineup. The district court chalked these inconsistencies up to the quick and chaotic nature of an ambush. It also disregarded the fact that neither of Todd's two sources mentioned Stanley as a participant.

Stanley also argues that the finding that he participated in the shooting of Jonte Robinson was based on unreliable, inconsistent, and untrustworthy evidence. The district court chose to credit Todd's testimony, which implicated Stanley. Stanley had rented the car that a witness saw during the incident, and he later returned that car to the rental company without license plates and traded it for a different car. Stanley argues that Todd was an admitted perjurer who could not be trusted, and that his testimony conflicted with the testimony of Robinson on details such as the type of car Stanley had and where he was shot. Ford told law enforcement that Derrick, not Stanley, was the shooter.

These discrepancies were for the district court to resolve. The government needed to satisfy only the preponderance of the evidence standard. *United States v. England*, 555 F.3d 616, 622 (7th Cir. 2009). In addition, although due process requires reliable evidence, the rules of evidence and the Confrontation Clause do not apply at sentencing, and so the court may rely

on hearsay even if the defendant did not have an opportunity to cross-examine witnesses. See *United States v. Bogdanov*, 863 F.3d 630, 635 (7th Cir. 2017).

Although the witnesses did not agree on the details, Jones, Derrick, and Ford all placed Stanley at the scene of Robinson's shooting. "[A] sentencing court may credit testimony that is totally uncorroborated and comes from an admitted liar, convicted felon, or large scale drug-dealing, paid government informant." *United States v. Clark*, 538 F.3d 803, 813 (7th Cir. 2008) (internal quotation marks omitted). That is what the court did, accepting Todd's testimony that he met Stanley and Derrick in front of a daycare center. Stanley was in a GMC vehicle and Derrick was in a white Grand Am. Stanley pointed Robinson out and then someone in the Grand Am began shooting. Bush, who was with Stanley, also began shooting. Todd's testimony was corroborated by a CPD officer's testimony that an eyewitness to the shooting reported a license plate of a vehicle at the scene. The report matched National Car Rental records showing that Stanley rented a blue GMC SUV that was returned on the day of the shooting without license plates.

Next, Stanley asserts that the district court abused its discretion by running Stanley's sentence consecutively to his undischarged sentence for the Springfield drug conviction. The government points us to 18 U.S.C. § 3584(a), which says that if a defendant is "already subject to an undischarged term of imprisonment," the court may run a term of imprisonment "concurrently or consecutively" to the undischarged term. The default rule is that "[m]ultiple terms of imprisonment imposed at different times run consecutively unless the court orders that the terms are to run concurrently." 18 U.S.C.

§ 3584(a). Section 3584(b) instructs a court to consult the section 3553 factors when it makes its decision between the two options. As we indicated earlier, that is just what the court did here.

Stanley responds in two ways. First, he emphasizes that the Springfield conduct was relevant conduct to the racketeering case. See U.S.S.G. § 1B1.3(a)(1)(B). Accordingly, Guideline § 5G1.3(b) applies. It states: "If … a term of imprisonment resulted from another offense that is relevant conduct to the instant offense of conviction … the sentence for the instant offense shall be imposed to run concurrently to the remainder of the undischarged term of imprisonment." Stanley seizes on the word "shall" to argue that a concurrent sentence was mandatory.

But nothing in the Guidelines is mandatory anymore. *United States v. Booker*, 543 U.S. 220 (2005), "made all Guidelines advisory; the judge must understand what sentence the Guidelines recommend but need not impose it." *United States v. Bangsengthong*, 550 F.3d 681, 682 (7th Cir. 2008). We have recognized that courts are "free to disagree with a guidelines recommendation, as the court did here when it rejected concurrent sentences under section 5G1.3(b)." *United States v. Moore*, 784 F.3d 398, 404 (7th Cir. 2015). The district court in the present case thus was free to choose to impose consecutive sentences.

Stanley also urges that the court should at least have imposed a partially concurrent sentence because he was sentenced as a career offender in the Springfield case. Although the career-offender designation was correct at the time of sentencing, Stanley argues, his earlier Illinois Residential Burglary conviction is no longer a qualifying predicate offense for

the enhancement. Because of this, instead of 262 months, he argues that he would have received only 120 months for the Springfield conviction, as there is nothing in the record to suggest the sentencing judge would have imposed an upward variance of 142 months. He concludes that a partially concurrent sentence was necessary to avoid a composite sentence that is greater than necessary.

We see no abuse of discretion on the district court's part. The Springfield sentence was imposed post-*Booker*, and so that court had the discretion to depart from the Guidelines. It chose not to do so. Here, the district court explained in detail why it was choosing consecutive sentences, and we have no reason to overturn its decision.

## V

We have hardly spoken of Byron Brown so as not to add unnecessary length to an already long opinion, but Brown was also actively involved with the Hobos. We need not delve into all his criminal activity, which included drug dealing, home invasions, robbery, shootings, and murder. It is enough to give a brief summary of the facts pertinent to his individual contentions.

On August 27, 2014, Brown pleaded guilty to Count 1, racketeering conspiracy in violation of 18 U.S.C. § 1962(d), and Count 4, murder in aid of racketeering in violation of 18 U.S.C. § 1959(a). He was represented by two appointed attorneys, Robert Loeb and Keith Spielfogel, during the proceedings in the district court, including at the change-of-plea hearing. (Under 18 U.S.C. § 3005, as a person facing potential cap-

ital charges, Brown was entitled to representation by two attorneys, at least one of whom was knowledgeable about the defense of death penalty cases.)

At the change-of-plea hearing, the district court found that Brown was competent to enter a guilty plea. Brown stated multiple times, under oath, that he was satisfied with both of his attorneys' representation. He confirmed that he had an opportunity to review with his attorneys the proposed plea agreement, and he stated he did not need more time to discuss the plea agreement with counsel. Brown confirmed that he did not have any questions that were left unresolved in his mind about whether he should enter into the plea agreement. Brown also confirmed that he had reviewed and signed the plea agreement, and that no one had threatened him or pressured him to do so.

The district court discussed the terms of the plea agreement's cooperation provision with Brown. Although the murder-in-aid-of-racketeering charge carried a mandatory minimum term of life imprisonment and the possibility of the death penalty, the agreement specified an agreed sentence of 35 to 40 years' imprisonment, conditioned on Brown's continued cooperation with the government. At the request of the district court, the government summarized what would be required of Brown under this provision, telling him that he was expected to give "complete and truthful testimony in any criminal, civil, or administrative proceeding[.]" Brown confirmed that he understood and agreed to do so. He also confirmed that he understood that the government had sole discretion to determine whether he lived up to that obligation.

Brown also acknowledged that he would not be able to withdraw his guilty plea, and he confirmed his understanding that he would be subject to life imprisonment if the government determined he had not kept up his end of the bargain. Next, the court established a factual basis for Brown's guilty plea. Afterward, it returned to the issue of voluntariness, confirming that no one had threatened or forced Brown to plead guilty. The court then accepted his guilty plea.

The prosecutors later discovered that Brown had provided materially false information to the government. He did so during interviews and during testimony before the federal grand jury. Accordingly, the government told Brown that it would not seek a reduced sentence on Brown's behalf.

On November 17, 2015, the district court set a sentencing date. One month later, on December 23, Brown filed a *pro se* demand for special appearance and a motion to strike his guilty plea. On January 21, 2016, Brown's lawyers filed a motion to withdraw, which the court granted. It then struck the sentencing date and appointed new counsel for him.

On May 20, 2016, Brown moved to withdraw his guilty plea. He alleged that he received ineffective assistance from Robert Loeb before pleading guilty. Brown asserted that Loeb had threatened and coerced him to plead guilty even though he knew Brown had testified falsely before the grand jury.

The district court denied Brown's motion a month later without an evidentiary hearing, finding that Brown's accusations were "exceedingly unreliable," and that "summary denial without a hearing [was] warranted." On March 14, 2017, the district court sentenced him to concurrent terms of life imprisonment on the two counts.

Brown argues that the district court erred when it decided not to hold an evidentiary hearing to investigate whether he should be allowed to withdraw his guilty plea. Brown claims that counsel was ineffective, as defined in *Strickland v. Washington*, 466 U.S. 668 (1984), by (1) failing adequately to advise him that he would be required to testify at trial and (2) failing to investigate the circumstances surrounding his untruthfulness, possible coercion by law enforcement, and the possibility of correcting misstatements in the grand jury.

Guilty pleas, as we have stressed in the past, should not lightly be withdrawn. See, *e.g.*, *United States v. Chavers*, 515 F.3d 722, 724 (7th Cir. 2008). Only a few grounds merit this relief: "where the defendant shows actual innocence or legal innocence, and where the guilty plea was not knowing and voluntary." *United States v. Graf*, 827 F.3d 581, 583 (7th Cir. 2016). "A defendant who contends that his guilty plea was not knowing and intelligent because of his lawyer's erroneous advice must show that the advice was not within the range of competence demanded of attorneys in criminal cases*." United States v. Trussel*, 961 F.2d 685, 690 (7th Cir. 1992) (internal quotation marks omitted). Moving to withdraw a guilty plea does not automatically entitle a defendant to an evidentiary hearing. See *United States v. Collins*, 796 F.3d 829, 834 (7th Cir. 2015). A defendant must offer substantial evidence supporting his claim, and "if the allegations advanced in support of the motion are conclusory or unreliable, the motion may be summarily denied." *Id.*

We begin with Brown's contention that his counsel did not advise him that he would be required to testify at trial against his co-defendants. The record shows otherwise. As we noted, the district court ensured that Brown was fully informed

about the plea agreement and his cooperation obligations. Brown is simply experiencing buyer's remorse; the district court acted within its discretion in crediting his statements, made under oath, at the change-of-plea hearing.

Brown's assertion that his lawyers failed to investigate his truthfulness, coercion by law enforcement, and the possibility of correcting misstatements in the grand jury strikes us as somewhat bizarre. In any event, Brown did not present this theory to the district court. We therefore review Brown's argument for plain error, which requires error that is plain, obvious, and prejudicial. *United States v. Fuentes*, 858 F.3d 1119, 1120–21 (7th Cir. 2017). Brown has come nowhere near meeting that standard.

Moreover, even assuming Brown received ineffective assistance of counsel, he cannot show prejudice. "[I]n order to satisfy the 'prejudice' requirement, the defendant must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Hill v. Lockhart*, 474 U.S. 52, 59 (1985). We find this unlikely, as Brown was deciding between a plea and a possible death sentence. In addition, under Brown's plea agreement, the government had the sole discretion to decide whether Brown provided complete and truthful cooperation deserving of a § 5K1.1 motion.

## VI

Rodney Jones pleaded guilty pursuant to a plea agreement to one count of RICO conspiracy in violation of 18 U.S.C. § 1962(d). He was sentenced to 450 months in prison, reduced by 110 months to account for time that he already had served in a related state case. Jones filed a timely notice of appeal, but

his appointed counsel has moved to withdraw under *Anders v. California*, 386 U.S. 738 (1967), because she believes an appeal to be without merit or possibility of success. Pursuant to Circuit Rule 51(b), Jones was notified of the opportunity to respond to his counsel's motion to withdraw, but he did not do so. Having considered counsel's brief, which addresses the topics one would expect to see in this situation, we grant her motion to withdraw and dismiss the appeal.

Jones was a member of the Hobos and participated in many of the crimes discussed above and others, including armed robbery of a marijuana dealer, the attempted murder of Courtney Johnson, home invasion and attempted robbery, the murder of Daniel Dupree, and the home invasion and felony murder of Tommye Freeman (the elderly woman whose car he struck while trying to elude law enforcement). Jones was charged with RICO conspiracy, and in February 2016, he pleaded guilty and admitted to facts regarding the predicate RICO acts.

In the plea agreement, the parties agreed to the relevant guidelines calculations. In addition, Jones promised to provide complete and truthful information to the government and give complete and truthful testimony if called upon to do so. In exchange, the government agreed that "[a]t the time of sentencing, the government shall make known to the sentencing judge the extent of defendant's cooperation. If the government determined that defendant has continued to provide full and truthful cooperation as required by this Agreement, then the government shall move the Court, pursuant to Guideline § 5K1.1, to depart from the low end of the applicable guideline range, and to impose the specific sentence agreed to by the parties as outlined below." The agreement specified that if the

government so moved, "the parties have agreed that the sentence imposed by the Court be a term of imprisonment in the custody of the Bureau of Prisons of not less than 360 months and not more than 504 months." The court was to have discretion to reduce the sentence below 360 months only to account for time Jones served in state custody pursuant to charges brought against him by the Cook County State's Attorney's Office in *People v. Rodney Jones*, 09-CR-1125729, as the underlying offense conduct in that state case was part of the offense conduct in the present case. The Cook County case was for the felony murder of Freeman. In it, Jones was found guilty of this offense in March 2013, and he was sentenced to 42 years in state prison. After an agreement between the parties to the federal case and the State's Attorney, that state sentence was reduced to 25 years on July 2016. Critically, the federal plea agreement also included a waiver of Jones's right to appeal his conviction and sentence.

In November 2017, the government filed a sentencing memorandum. Pursuant to section 5K1.1, it asked for a sentence of 297 months based on Jones's cooperation and testimony at trial. The government indicated that this sentence was calculated based on a total sentence of 418 months in prison for the federal case, which was then reduced by 121 months for the time Jones had spent in prison for the Freeman murder. Jones requested a total sentence of 239 months based on various mitigating factors.

The district court held a sentencing hearing on November 20, 2017. It rejected both requests and chose a sentence of 450 months, which it then reduced by the 110 months that it calculated Jones had already served for the Freeman case. This

resulting in a federal sentence of 340 months, to be served concurrently with the remainder of the state court sentence. The court imposed restitution of $22,272.16 for two victims, but it declined to impose a fine. Jones also received a special assessment of $100 and a three-year term of supervised release.

Counsel first considers whether any challenge to Jones's conviction would be frivolous. Jones indicated to her that he wants to withdraw his guilty plea, and so a potential issue for appeal would be whether his plea was knowing and voluntary. Because Jones did not move to withdraw his guilty plea in the district court, our review is limited to determining whether plain error occurred. *United States v. Driver*, 242 F.3d 767, 769 (7th Cir. 2001).

Counsel identifies two Rule 11 omissions by the district court during the change-of-plea hearing. First, the court did not inform Jones of some of the rights he was waiving by pleading guilty. These rights included the right to plead not guilty, the right to assistance of counsel, and the right to confront witnesses. See Fed. R. Crim. P. 11(b)(1)(B), (D), & (E).

"Compliance with Rule 11 is not meant to exalt ceremony over substance." *United States v. Coleman*, 806 F.3d 941, 944 (7th Cir. 2015). "If the record reveals an adequate substitute for the missing Rule 11 safeguard, and the defendant fails to show why the omission made a difference to him, his substantial rights were not affected." *Id.* at 944–45. Here, Jones knew he could plead not guilty because he previously had pleaded not guilty. In addition, Jones knew that he had the right to counsel's assistance because he had been continuously represented since his arraignment. And Jones's plea agreement advised him that he had the right to confront witnesses at trial.

Thus, any error made by the omission did not affect Jones's substantial rights. See Rule 11(h).

The court also failed to discuss the appeal waiver contained in Jones's plea agreement. See Rule 11(b)(1)(N). To show that this omission affected his substantial rights, Jones would have to show that there is a reasonable probability that, but for the Rule 11 error, he would not have pleaded guilty. *United States v. Dominguez Benitez*, 542 U.S. 74, 76 (2004). The appeal waiver is unambiguous, and Jones told the district court multiple times that he had read the agreement and discussed it with his attorney. He also acknowledged in the plea agreement that his attorneys had explained the rights he was waiving, that he had read and reviewed each provision with his attorney, and that he understood and accepted every term. Counsel notes that it is difficult to see how the omission of the appellate waiver warning by the district court at the change-of-plea hearing could have affected Jones's decision to plead guilty, given the benefits he received under the agreement, including a sentence that falls well below the guidelines recommendation of life in prison. We agree and find no plain error.

Counsel next considered whether any challenge to Jones's sentence would be frivolous. Jones explicitly waived the right to appeal his sentence in his plea agreement, and we review the enforceability of a waiver of appeal rights *de novo*. *United States v. Woods*, 581 F.3d 531, 534 (7th Cir. 2009).

Because Jones's guilty plea was knowing and voluntary, his waiver of appellate rights in the plea agreement was also knowing and voluntary. We will honor that waiver unless "the trial court relied on a constitutionally impermissible factor (such as race), or … the sentence exceeded the statutory maximum." *Jones v. United States*, 167 F.3d 1142, 1144 (7th Cir.

1998). Neither exception applies here. Jones's sentence of 450 months was within the statutory maximum (life imprisonment) and it was within the parties' agreed range. Jones's sentence was also not the result of a constitutionally impermissible factor. Therefore, we grant counsel's motion to withdraw, and we dismiss Jones's appeal.

## VII

In the end, almost the entirety of this complex criminal trial will remain undisturbed thanks to Judge Tharp's excellent handling of the case. We AFFIRM the convictions of all the defendants. We also AFFIRM the sentences of all the defendants except for Chester. We VACATE Chester's sentence in 13 CR 288, appeal No. 17-3063, and order a limited remand for further proceedings consistent with this opinion. In Jones's case, No. 17-3449, we GRANT Counsel's motion to withdraw and DISMISS the appeal.